WING v. McCALLUM.

SAME v. SEDGWICK.

(District Court, D. Massachusetts. July 6, 1916.)

Nos. 483, 484.

CORPORATIONS ⊜⟶77—SUBSCRIPTION TO STOCK—CONSTRUCTION OF CONTRACT—RIGHTS AND LIABILITIES OF PARTIES.

Defendants and others, members of a syndicate to underwrite the stock of a new corporation, who had subscribed and paid for at par a part of the stock, entered into a contract with others, designated as managers, by which they transferred to the managers the stock purchased, and severally agreed to take in the aggregate all the remaining stock and pay for the same on call not earlier than a future date named. The managers were authorized to borrow money to make immediate payment for such stock, to give their note or notes therefor, which should be binding on the members of the syndicate, and to pledge as collateral therefor the subscribers' contracts to buy the stock and to pay loans made by the managers on their accounts and all the stock of the corporation. On payment of their subscriptions the members of the syndicate were to receive stock at par equal to their total subscriptions, including that previously paid for. Being unable to secure a loan for the amount required, the managers subscribed for and received the remaining stock, and paid for it with their own nonnegotiable note to the corporation. At the same time they transferred all of the stock and the syndicate contract to a trustee as security for payment of the note, which was also assigned to the trustee by the corporation, but was three years later reassigned and sold by the corporation subject to certain participation certificates which had been sold by the

trustee. To these transactions the members of the syndicate were not parties, nor did they ratify the same. The note not having been paid, the trustee brought suits against defendants on their subscription agreements to recover the full amount of their subscriptions for the benefit of the holders of the note. There were no allegations as to the amounts received by the trustee from the sale of participation certificates nor what was done with the money, nor as to the amount actually realized by the corporation from the note. *Held,* that the execution by the managers of their own note in payment for the stock issued to them and the sale of such note by the corporation was not a borrowing of money by the managers, nor within the authority given them by the syndicate contract, one purpose of which was to secure for the corporation at once its entire capital for use in its contemplated business; that on payment of their subscriptions defendants were entitled to receive therefor shares of stock of the corporation with its capital fully paid in at par, and that, in the absence of a tender of such stock or allegations showing that it could and would be delivered, the actions could not be maintained.

At Law. Action by Thomas E. Wing, trustee, against Alexander McCallum, and same against Alexander Sedgwick. On demurrers to declarations. Demurrers sustained.

Coolidge & Hight, of Boston, Mass., and Wing & Russell, of New York City, for plaintiff. Whipple, Sears & Ogden, of Boston, Mass., for defendants.

MORTON, District Judge. These two actions were heard together upon demurrer, and the question in each case is whether the declaration states a good cause of action. The declarations are the same mutatis mutandis.

The defendants and others, hereinafter called interchangeably the "subscribers" or "underwriters," entered into a written agreement bearing date September 1, 1907, for the purpose of promoting a corporation known as the Refugio Syndicate, referred to in this opinion as the "corporation." This agreement (hereinafter called the "syndicate agreement" or "agreement"), was by the underwriters with each other, and by them as parties of the second part, with certain other persons, parties of the first part, appointed by them to act as their agents, and called in the agreement the "syndicate managers," or "managers." The present actions are based upon this agreement. Copies of it, and of two other later agreements growing out of it, to which the defendants are not parties, entitled respectively the "trust agreement" and the "depositors' agreement," are annexed to and made a part of the declarations.

The corporation was organized under the laws of New Jersey with a capital of $1,000,000, divided into 10,000 shares of the par value of $100 each. By whom it was organized, or for what purpose, if material, does not appear. That it was, to some extent at least, a speculative venture, seems evident from certain provisions in the syndicate agreement relating to the sale or exchange of the stock. To start the enterprise 2,000 shares were taken and paid for in cash at par by the underwriters. They were desirous, as the syndicate agreement recites, of providing for the purchase of 8,000 additional shares, in other words, of the remaining shares as the capital then stood; but they did not wish to take and pay for them at once, as they had done

with the 2,000 shares. At the same time they understood (as agreed at this hearing) that the corporation must have money to do business with. This money would naturally be obtained by paying in the capital. Part of it had been so obtained, as already noted, from the sale of the 2,000 shares. It was evidently contemplated that the remaining 8,000 shares should be taken and paid for, and that money for that purpose should be borrowed by the managers and repaid from the underwriting subscriptions.

Pursuant to the scheme thus outlined, the syndicate managers subscribed for the 8,000 shares, and agreed to pay cash for them at par; and the underwriters severally, and not jointly, agreed to take proportionate parts of the 8,000 shares, and to pay cash for the same at par on call by the managers, not, however, before January 1, 1909, unless otherwise agreed to by 75 per cent. in interest. The underwriters transferred to the managers the 2,000 shares they had taken and paid for in cash, and authorized the managers to borrow for each underwriter, on their (the managers') note or other obligation, which was to be binding on the underwriter, a sum not exceeding his cash subscription, to become due not before March 1, 1909. The managers were also authorized to pledge as security for the loan or loans so obtained the 2,000 shares transferred to them as above, the agreements of the underwriters to buy the stock, and the underwritten capital stock. I construe this last clause as meaning the stock issued to the managers upon payment therefor with the money borrowed by them. The 2,000 paid-up shares were intended to furnish a margin of security for the money so borrowed.

The managers were not required to make a separate loan for each subscriber, but were at liberty to make a single large loan if it could be done. Upon payment in cash at par at any time of his full subscription an underwriter was entitled (whether the money borrowed by the managers was in one large loan or otherwise) to the stock which he had agreed to take, and also to stock for that which he had transferred to the managers; in other words, in the language of the syndicate agreement, "to $1,000 face value in said capital stock of said Refugio Syndicate for each $800 of his cash subscription." The managers were given the "sole direction, management, and conduct of the syndicate." "The enumeration of particular and specific powers," it is said, is not to be "considered as in any way limiting or abridging the general power or direction intended to be conferred upon and reserved to the syndicate managers." The corporation itself was not a party to the agreement, which was wholly between the underwriters and the syndicate managers. The agreement was to become operative and binding only upon certain conditions, as to which it is enough to say that, according to the allegations of the declaration, they must be taken to have been met.

The gist of the scheme was, as I construe the syndicate agreement, that eventually the whole capital stock should be divided among the underwriters in certain proportions, unless previously sold or exchanged, and that they should pay cash at par for the same, that they were to take and pay cash at par at once for 2,000 shares, and transfer them

to the managers (which they did), and bind themselves to the managers to take and pay for in cash at par on call, not before January 1, 1909, the remaining 8,000 shares, unless otherwise agreed before then, and that in the meantime, in order to provide the rest of the capital promptly, the managers should subscribe for the 8,000 shares and borrow the money to pay for them, pledging as security for the loan the 8,000 shares so paid for, the 2,000 shares, and the subscription agreements of the underwriters.

I do not construe the agreement as authorizing the managers to borrow money generally for commercial purposes to carry on the business of the corporation. Neither, as I understand him, does the plaintiff. The scheme was a promoters' scheme, not one for carrying on the business of the corporation; and the authority of the managers was limited to borrowing money to pay for the 8,000 shares of stock which the underwriters desired to purchase. Nothing is said in the agreement about the managers subscribing for the 8,000 shares. But, as counsel for the petitioners said, "They had to subscribe for the stock;" otherwise (the conclusion is mine) they would not have been in a position to deliver the shares to which the underwriters were entitled upon payment of their subscriptions. There is no express provision that the money borrowed shall be applied to the payment of the 8,000 shares. But that is the plain import of the agreement; and it is agreed by counsel for the petitioner that that is what was to be done. Indeed, unless the money was so applied, the underwriters would, or might, be liable not only for their subscriptions, but also for money borrowed by the managers; in other words, would run the risk of a double liability, which cannot for a moment be supposed to have been intended.

The syndicate agreement had hardly taken effect when, as all parties agree, the panic of 1907 came on, and it was impossible for the managers to raise in one large loan the money required to pay for the 8,000 shares. The situation then was that the underwriters had individually bought and paid for 2,000 shares of the Refugio stock and had deposited them with the managers, with the expectation that the remaining shares would be subscribed for by the managers and promptly paid for by a loan, and the business of the corporation begun. The underwriters had agreed to take their pro rata parts of the 8,000 shares and to pay the managers for them, but not before January 1, 1909, without the further assent above referred to; and it had become impossible for the managers to obtain the money to pay for the 8,000 shares and complete the capitalization of the syndicate so that it could begin business.

The situation was undoubtedly one of much difficulty. It remained in abeyance until March 2, 1908, on which date, nothing so far as appears having been done in the meantime, and the agreement continuing in force, the following course was adopted: The managers made their nonnegotiable note for $800,000, payable to bearer without grace on the 1st day of March, 1909, and delivered the same, as I understand what was done, to the Refugio Syndicate; and that corporation turned over to them the 8,000 shares of stock. Under the same date, and as part of the same transaction, the managers en-

tered into an agreement with the Guardian Trust Company of New York by which they transferred to it the "syndicate agreement" and the 10,000 shares of Refugio stock (i. e., the 8,000 shares so received and the 2,000 previously bought by the underwriters), to be held by it in trust for the benefit of the holder or holders of the note and "of all persons who shall or may have an interest therein." Also as part of the same transaction the Refugio Syndicate made an agreement with the same trust company by which it transferred the note to the trust company, with authority to sell and issue upon its (the Refugio Syndicate's) order participation certificates therein.

These agreements are called respectively the "trust agreement" and the "depositors' agreement," and copies of them are annexed as aforesaid to the declaration. The "trust agreement" is a lengthy instrument with numerous provisions relating to various matters into which it is not necessary to go in detail. The "depositors' agreement" is a simpler document. The "trust agreement" provides, among other things, that if any subscriber to the "syndicate agreement" pays to the trustee the full amount unpaid upon his subscription, the trustee shall, in accordance with paragraphs II and V of said "syndicate agreement," transfer and deliver to him his proportionate share of the capital stock of the Refugio Syndicate, or the voting trust certificates representing the same, then held by the trustee. This plainly was intended to provide for the delivery to such subscriber of the stock to which he was entitled upon payment in full in cash of his subscription. Whether a subscriber could be compelled to accept voting trust certificates in lieu of stock may be doubted, but that question does not arise; non constat that any subscriber would ever be asked to do so. The money received by the trustee from underwriters was to be applied by it, after deducting its own charges and expenses, to the payment of the note. See Trust Agreement, cls. VII and IX.

The "trust agreement" also provides for the filling of any vacancy caused by resignation or otherwise in the office of trustee, and for the vesting in the new trustee upon his appointment, without any further act, deed, or conveyance—in other words, automatically—of the property and securities then held by the trustee under the "trust agreement" and "all of the estates, trusts, rights, powers, and duties" of said trustee. The declaration alleges that the Guardian Trust Company resigned as trustee, and that the plaintiff was duly appointed and qualified in its place.

The result of this whole arrangement was that the Refugio Syndicate issued to the managers the 8,000 shares which the underwriting agreement contemplated should be purchased by them for cash, and received therefor no cash at all, but only the $800,000 note. It lodged this note with the trust company, and authorized participations therein to be sold on its account; and the managers deposited with the trust company the 2,000 shares originally purchased by the underwriters, the 8,000 shares received in exchange for the note, and the underwriting agreements of the several underwriters, as collateral security, not for such amounts as might in fact be received by the Refugio Syndicate from lenders, but for the payment of the note itself. In considering the complicated and difficult situation which has

arisen, it must be clearly borne in mind that the foundation of the new arrangement was the note, that the defendants' agreements are avowedly held by the plaintiff only as security on the note, and that this action is admittedly for the purpose of enforcing the collateral in order that the note itself may be paid.

Participation certificates in the note were sold and issued by the trust company; to what amount does not appear. It is said in one of the opinions, of which copies are attached to the plaintiff's brief, that certificates were issued to the amount of several hundred thousand dollars. But there is no allegation to that effect in either declaration.

The Guardian Trust Company resigned as trustee in September, 1910, two years or more after the execution of the trust agreement, and the petitioner was, as above noted, duly appointed in its place. At the same time the trust company redelivered the $800,000 note to the corporation, and the holders of participation certificates issued by the trust company surrendered them to the corporation and received in lieu thereof participation certificates from the corporation. The depositors' agreement entered into between the corporation and the trust company was abrogated. Later, in October, 1911, the corporation sold and delivered the note, subject to outstanding participation certificates therein, to one McDougall, who purchased the same for account of the Consolidated Gold Fields of South Africa, Limited. The note was not paid when it fell due, and is still outstanding and unpaid. Calls were made on the defendants by the syndicate managers for the payment of their subscriptions, and demand was made upon them by the plaintiff. The defendant McCallum has made two payments, but has refused to make any further ones. The defendant Sedgwick has paid nothing.

The plaintiff brings this action as substituted trustee to recover the entire balance of the defendants' subscriptions, not their proportional parts of the amounts actually borrowed, "for the holders of the aforesaid note and for the syndicate managers." Decl. par. 13. The last clause might imply that the object was simply to collect on the underwriting, regardless of any loan; in other words, to enforce a call thereon. But counsel for the plaintiff stated at the argument that the action is not pressed on that ground. The plaintiff's position is that he is acting as trustee under the trust agreement, and is attempting to realize upon the security which he holds as such trustee for the payment of the note. The plaintiff contends that "the trustee is now doing the very thing for which he was appointed trustee, to wit, attempting to collect from these underwriters what they owe in order that the *note* may be paid." Plaintiff's Argument, p. 27. Italics mine. See, too, Plaintiff's Brief, p. 15. This is a correct statement of the duties of the trustee, and of the only purpose for which he holds the defendants' subscription agreements under fifth, sixth, seventh, and ninth clauses of the trust indenture of March 2, 1908 (Exhibit B). No ratification by the defendants of unauthorized action by the managers is alleged in the declaration; and no such contention was made on behalf of the plaintiff at the arguments on the demurrer.

I assume in the plaintiff's favor, though it is nowhere distinctly al-

leged, that the actions are brought not only for the benefit of Mc-Dougall, but also for the benefit of the holders of participation certificates.

It seems clear that the note is enforceable against these defendants, if at all, only to the extent that it represents money borrowed by the syndicate managers for the purpose for which they had the right to borrow money on account of the underwriters, viz. for the purpose of purchasing for the underwriters the 8,000 shares. The first question, and one which lies at the threshold of the case, is whether (waiving for a moment all questions as to the validity of the note, the legality of the issue of the 8,000 shares, and the right of the managers to enter into the trust agreement) the sale of the note by the corporation to, and its purchase by, McDougall under the circumstances shown, and the sales of certificates of participation in the note, constituted borrowings by the syndicate managers.

So far as the McDougall transaction is concerned, it seems to me that the question answers itself, and that in no just sense was it such a borrowing. The sale to him took place three years after the trust agreement was entered into, and more than a year after the trust company had resigned as trustee and the plaintiff had been appointed. The syndicate managers do not seem to have had anything to do with it. It was a transaction between the corporation and McDougall, and is, in substance, so alleged. I do not think that it can be said that a sale of the note by the corporation to a third party constituted under any and all circumstances a borrowing by the syndicate managers of the amount received by the corporation. But that is the result to which, as matters stand, we must come in order to say that there was a borrowing by the syndicate managers in the sale of the note by the corporation to McDougall. It may be that the corporation could sell the note as it could a bond secured by mortgage, though I do not think the analogy is quite correct. But the question here is not of the right of the corporation to sell the note. It is whether a sale of it under the circumstances described constituted a borrowing by the managers. As I have said, I do not think it did.

As to the participation certificates, the managers had authority to borrow money and bind the underwriters therefor, as already observed, only for the purpose of paying for the 8,000 shares for which they had subscribed, and the purchase of which, in the interest of the underwriters, was the principal, if not the sole, object of the syndicate agreement. The scheme contemplated that the money borrowed by the managers, or by their authority, should be applied to the payment of those shares; so that, when the underwriters paid up their subscriptions, they would receive stock in a corporation whose capital of $1,000,000 had been paid in full, and the shares in which each represented $100 paid in cash. Any scheme not calculated to secure that result was not within the managers' authority.

Not only is there no allegation that the money received from the sale of participation certificates was applied by the corporation in payment for the stock, but it affirmatively appears, I think, that the 8,000 shares, which apparently are to be turned over to the underwriters as pay-

ment of their subscriptions, were issued in violation of law. The New Jersey statute, of which this court takes judicial notice, provides that:

"Nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under this act." N. J. Corporation Act (2 Comp. St. 1910, p. 1630) § 48.

See Dill on N. J. Corporations (3d Ed.) p. 73.

The only thing given in payment, if payment it can be called, by the syndicate managers for the 8,000 shares issued to them, was, so far as appears, the note for $800,000. This was in plain violation, I think, of the statute. See Maine v. Butler, 130 Mass. 196; Pierce v. Bryant, 5 Allen (Mass.) 91.

The plaintiff contends that there was no issue of stock within the meaning of the statute:

"We again urge upon this court the suggestion that there was no issue of stock in the sense in which that term is used in the statute. * * * It was plainly the intent of the parties that the stock should be fully paid for in cash before it became outstanding." Plaintiff's Supp. Brief, p. 4.

It is enough to say that the syndicate managers, the corporation, and the trust company all treated it as an issue.. If the stock was not issued, the plaintiff's case is certainly no better. Money received in this action will be paid by the trustee to persons interested in the note, and the stock will apparently be turned over as it is to the underwriters, or not turned over at all, and the defendants will get nothing for their money. If so, the scheme adopted by the managers differs essentially from that authorized by the underwriting agreement.

The plaintiff's position is, as I understand it, that, as soon as any participation was sold, the underwriters' liability became fixed for the full amount of their subscriptions as collateral on the note, that the trustee can enforce the agreement to the full extent of the subscription, and that, if the defendants are not liable for more than their proportionate parts of the amounts actually received by the Refugio Syndicate for sales of participations and of the note, which the plaintiff does not admit, the surplus is to be returned to the underwriters as excess collateral; in other words, that the sale of a $1,000 participation fixed the underwriters with liability for the full amount of the $800,000 note.[1]

I do not think that this position is sound. The underwriters never agreed to guarantee all commercial paper or all obligations which the managers might think it wise to put out or assume. They authorized

---

[1] The plaintiff's counsel thus stated its contention: "Now, assume that as a matter of defense these defendants can show, if it be a fact, that our cestuis qui trustent of this trust are not entitled to a full return and that their obligations may, perhaps, have to be scaled down pro rata. I do not concede that, but I say that such a contention might possibly be made. If it be a proper contention, it is a contention by way of defense. The underwriting agreement was collateral. The collateral can be enforced for the full amount. I know of no rule of law which forbids the holder of collateral exceeding the amount of the obligation for which it is collateral from enforcing and collecting the full amount of the collateral, so he will have to account to somebody for the excess, and it may be that we will have to account later for some excess to these underwriters. I don't know. But whether that is so or not, that is a matter of defense. That is a matter on the evidence, not on the demurrer."

the managers, as has already been said, to borrow on their account money to pay for the 8,000 shares which they wished to acquire, and which they expected to come to them, on payment of their subscriptions, as stock on which $100 a share had been paid, and also, it would follow, as stock in a company whose capital of $1,000,000 had been paid in full. There are no allegations as to the amounts actually received from the sale of the note or from the sales of participations in it nor as to what was done with the money. For aught that appears, the note and participations may have been sold by the corporation at large discounts, or the money received may have been paid to or received by the trust company, and may be held by it against the note, as the trust agreement provides shall be the case with moneys paid upon the subscription agreement. In either case the situation would be one not contemplated by the underwriters, and in regard to which the syndicate managers had no authority to bind them.

While the sale of participation certificates in the note made and issued by the syndicate managers was, if done with their procurement and assent, not open to objection as a mode of borrowing, the sales of such certificates and of the note in the market by the corporation for any price that it or they would bring, which, for aught that appears, is what was done, was, I think, outside the scope of the authority conferred upon the syndicate managers, and created no binding obligation on the underwriters. The general power and discretion given to the managers in the direction and management of the syndicate cannot be construed as enlarging a limited agency into a general one, but must be construed as relating to the exercise of powers within the scope of the authority conferred. Whatever may be the meaning of the provision in the syndicate agreement that the note or other obligation of the managers shall be binding on the subscribers without any duty on the part of the lender to inquire into the performance by the managers of their obligations, it cannot relieve the lender from the effect of knowledge of the character of the undertaking on the part of the underwriters and of the relation of the managers thereto, as shown in the syndicate agreement, of which the lender is bound to take notice by reason of the reference thereto contained in the note.

There is a still further difficulty with the cases as they stand. As I have said, each subscriber or underwriter is certainly entitled upon payment in full at par in cash of his subscription to the stock for which he subscribed, fully paid, and to stock for that which he transferred to the managers, requoting the syndicate agreement, "to $1,000 face value in said capital stock of said Refugio Syndicate for each $800 of his cash subscription." These provisions are incorporated by express reference into the trust agreement. The result is, it seems to me, that the plaintiff cannot compel performance by the defendants of their subscription agreements unless he is ready and willing to deliver to them on payment of their subscriptions the stock to which they are entitled. There is no allegation in either declaration of readiness to deliver such stock upon payment by the defendants of their subscriptions; and it is not alleged that there has been any offer or tender of it. Such an allegation would not be necessary if the plaintiff's theory that the defendants became absolutely liable on their subscriptions as

collateral to the note upon the sale of participations in the note, or absolutely bound by any note made by the managers, is correct. I have already said in another connection that this theory does not seem to me sound. It may well be doubted whether the plaintiff is in a position to deliver the stock if the issue of the 8,000 shares is illegal. The defendants cannot be compelled to take stock about the legality of whose issue there is a question, any more than a purchaser of real estate can be compelled to accept a doubtful title. But that question is not before me.

The defendants contend that the plaintiff cannot sue in his own name. The declaration alleges that the Guardian Trust Company recognized that the plaintiff was duly appointed trustee in the place of the Guardian Trust Company, and that he duly qualified as such trustee, and has since been acting as such. The trust agreement provides, as observed above, for the filling of vacancies in the office of trustee, whether caused by resignation or otherwise, and that the new trustee shall succeed to all the rights, property, powers, and privileges of the former trustee. It seems to be clear that, under the law of New York, which the trust agreement provides shall be the law by which it and the notes shall be construed and the rights of the parties determined, as well as under the laws of Massachusetts, the plaintiff has a locus standi.

If the questions presented by this demurrer were raised for the first time, I should feel obliged, for the reasons indicated, to sustain these demurrers. This underwriting has, however, been the subject of much litigation in the federal and state courts in New York, and the decisions there have been adverse to the subscribers; but no opinion has come to my notice showing satisfactorily the reasoning by which that result was reached. So far as I am informed, no state court of last resort has yet passed upon the matter, and it has not been decided by any Circuit Court of Appeals.

If the demurrer be overruled, the defendants will be put to the trouble and expense of a jury trial, which will go for nothing if what seems to me to be the correct view of the law should ultimately prevail. There is no way under the defective federal practice in which the questions raised by this demurrer can be presented to an appellate court without a trial on the merits, unless the demurrer be sustained. It seems to me, therefore, that notwithstanding the great respect which is due to the decisions on this matter of the New York courts, federal and state, the defendants are entitled to have me follow my own view and sustain the demurrer.

It should not, however, be lost sight of that to the extent to which participations were sold at par and the money realized therefrom reached the corporation and was applied in payment of the stock the result was in substance what the underwriters contemplated should be done. I express no opinion whether, consistently with the facts, the declaration can be so amended as to state a good cause of action in reference thereto.

Demurrers sustained.