## WING v. McCALLUM.

(District Court, D. Massachusetts. December 6, 1926.)

No. 484.

1. **Corporations** ☞661(6)—**Foreign corporation, though not authorized to do business in New York, may maintain action on contract made therein in courts of other states or federal court (General Corporation Law N. Y. § 15).**

General Corporation Law N. Y. (Consol. Laws, c. 23) § 15, providing that a foreign corporation, which has not received a certificate of authority to do business in the state, may not maintain any action in the state on any contract made by it therein, does not render such a contract void, nor prevent an action thereon in the courts of another state or the federal courts.

2. **Trusts** ☞169(2)—**Transfer of trust estate from old to new trustee held not necessary to vest the latter with title.**

If the instrument of trust provides for succession of trustees on resignation of the trustee and appointment of a new trustee, the trust estate vests in him according to its terms, without any instrument of transfer.

3. **Corporations** ☞80(11)—**Evidence held not to show that stock subscription was vitiated by fraud.**

Evidence *held* insufficient to show that a contract by which defendant and other members of a syndicate subscribed for stock of a corporation was induced by fraud.

At Law. Action by Thomas E. Wing, trustee, against George B. McCallum, executor. Judgment for plaintiff.

Coolidge & Hight, of Boston, Mass., and Wing & Russell, of New York City, for plaintiff.

Whipple, Sears & Ogden, of Boston, Mass., for defendant.

BREWSTER, District Judge. This is an action at law, brought by Thomas E. Wing, trustee, against Alexander McCallum, to recover a balance claimed to be due upon a subscription made by the said McCallum to a certain syndicate agreement, dated September 1, 1907, relating to the underwriting of shares of the capital stock of the Refugio Syndicate, a New Jersey corporation.

Alexander McCallum has since deceased, and his executor has been duly substituted as defendant herein. The word "defendant" in this opinion will refer to the original defendant, Alexander McCallum.

The same underwriting agreement has been considered by this court and by the Circuit Court of Appeals in the case of Wing v. Sedgwick, which was an action brought by the plaintiff Wing against another subscriber. See (D. C.) 244 F. 199; (C. C. A.) 254 F. 5; (D. C.) 299 F. 311; (C. C. A.) 4 F.(2d) 177. These opinions so fully deal with the terms of the agreement, the obligations of the subscribers, the rights of the plaintiff as trustee, and the acts of the parties involved, that it will be only necessary to briefly summarize the transactions, so far as material to the present inquiry.

The underwriting agreement, signed by the defendant and others, authorized the syndicate managers to subscribe for 8,000 shares of the capital stock of the Refugio Syndicate and empowered the managers to borrow money to pay for the stock thus subscribed for. The managers, assuming to act under the syndicate agreement, gave a promissory note for $800,000 to the Refugio Syndicate, dated March 2, 1909. This note was given and received in payment for 8,000 shares of the capital stock, of the par value of $100 each. Certificates representing 8,000 shares had previously been issued to the syndicate managers, which, with 2,000 other shares held by them, were exchanged for voting trust certificates. To secure the $800,000 note, voting trust certificates representing 10,000 shares in the Refugio Syndicate and the syndicate agreement were pledged and assigned to the Guardian Trust Company of New York City as trustee.

The Refugio Syndicate deposited the $800,000 note with the said Guardian Trust Company under an agreement which provided for the issuance by the Guardian Trust Company of participation certificates therein. The trust company issued under said agreement and upon the order of the Refugio Syndicate participation certificates aggregating $538,500. The principal of these certificates had been reduced by partial payments made out of proceeds of assessment upon the subscribers to the syndicate agreement, so that on September 28, 1910, there were outstanding certificates of participation amounting in the aggregate to $290,608. The holders were demanding payment, and on that date the Refugio Syndicate borrowed of the Consolidated Gold Fields of South Africa, Limited, $300,000, out of which it paid to certificate holders $264,368. All outstanding certificates of participation were surrendered for cancellation and canceled. The deposit agreement was terminated, and the note for $800,000 was delivered to the Refugio Syndicate. Holders of certificates amounting to $26,240, who did not receive cash for their participation certificates, received new participation certificates in the said note of $800,000 issued by the Refugio Syndicate. For the $300,000 advanced by the Consolidated Gold Fields of South Africa, Limited, the Refugio Syndicate gave its note of $300,000, and as security it pledged as collateral the $800,000 note given by the syndicate managers to the Refugio Syndicate. At the time of the cancellation of the deposit agreement and the certificates of participation issued by the Guardian Trust Company, no assignment was made by the Guardian Trust Company to the Refugio Syndicate of any rights or interest in the certificates of participation which it had theretofore issued. When all the participation certificates issued by it had been surrendered for cancellation, and had been canceled, and the deposit agreement terminated, the Guardian Trust Company resigned as trustee under the trust agreement, and the plaintiff was appointed trustee in its place.

All of these facts were before the court in the case of Wing v. Sedgwick, and the law applicable thereto, so far as bears upon the plaintiff's right to recover upon the subscription to the syndicate agreement, is definitely settled by the Circuit Court of Appeals.

By referring to the opinion (4 F.[2d] on page 177), it will be noted that it was the opinion of a majority of that court that:

"The arrangement under which the $800,000 note was deposited by the managers through the Refugio Syndicate with the Guardian Trust Company for the issuance of participation certificates therein was an authorized method of borrowing within the powers conferred upon the managers by the un-

derwriting agreement * * * of September 1, 1907, and consequently the pledging of the underwriting agreement and all the stock was authorized within the terms of that agreement, and that the underwriting agreement was not conditioned upon the subscribers receiving full paid stock legally issued; * * * that, if borrowing were had on the $800,000 note pursuant to the deposit and pledge, * * * the defendant having defaulted, the trustee would be entitled to recover from the defendant on the subscription agreement [the amount subscribed] less the payments he had made."

Again, on page 178, the court states:

"It is undoubtedly true that the loan of $300,000 by the Consolidated Gold Fields to the Refugio Syndicate upon the security of the $800,000 note as collateral was not in itself a borrowing by the managers within the contemplation of the underwriting agreement, but this tells only a small part of the story, for it appears that, on September 28, 1910, there were outstanding participation certificates, representing borrowings on the note, amounting to $290,608, to secure which the defendant's subscription agreement was pledged, the proceeds of which borrowings, at the time they were obtained, had gone into the hands of the Refugio Syndicate towards payment of the stock and to the credit of the subscribers, including the defendant, and that, while the transaction of September 28, 1910, was in form a cancellation of the outstanding participation certificates, it was in truth and in fact nothing more than an acquisition by the Refugio Syndicate of interests in the $800,000 note representing borrowings thereon amounting to $264,368 and a pledge thereof to the Consolidated Gold Fields as security for the $300,000 note. In this way the Refugio Syndicate became the equitable and probably the legal owner of the interests of a large majority of the holders of participations in the $800,000 note, which it assigned as collateral to the Consolidated Gold Fields, and which Consolidated Gold Fields later acquired by foreclosure."

The mandate of the Circuit Court of Appeals directed a judgment to be entered for the plaintiff for the full amount of the unpaid subscription of the subscriber, Sedgwick.

The defendant, McCallum, nevertheless presses the claim that judgment should not be entered for the plaintiff in the case at bar because of additional evidence adduced at the trial, and for the further reason that controlling points were not brought to the attention of or considered by the court in Wing v. Sedgwick.

The several contentions of the defendant and the additional facts upon which they are based will now be considered, with a view of ascertaining whether any new elements have been injected into the case, which will lead to results different from those reached by the appellate court in Wing v. Sedgwick.

[1] 1. I find that neither the Refugio Syndicate nor the Consolidated Gold Fields had received a certificate of authority to do business in the State of New York, and that the statutes of that state provide that a foreign corporation which has not received such a certificate of authority shall not maintain any action in the state upon any contract made by it therein. Consolidated Laws N. Y. c. 23, art. 2, § 15. I fail to see how the defendant can avail himself of this statute as a defense, for two reasons. In the first place, the contract under which plaintiff is seeking to enforce rights was not made by the Refugio Syndicate, or by any corporation. The contract of subscription was between individuals, and the assignment of it in the first instance was to a New York corporation clearly authorized to do business in that state. The plaintiff, succeeding to the rights of the Guardian Trust Company, may sue in any court to enforce the obligations of the subscribers. Moreover, it has been held that the statute of New York, above cited, does not render void contracts made in New York by a foreign corporation which has not complied with the requirements of the New York law regarding authority to do business in that state. It denies to such corporation the right to resort to the courts of New York, but does not prevent it from seeking redress in the courts of other states, or even in the federal court of New York. Mahar v. Harrington, 204 N. Y. 231, 97 N. E. 587, 38 L. R. A. (N. S.) 210; Lupton's Sons Co. v. Automobile Club, 225 U. S. 489, 32 S. Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699.

[2] 2. I find, also, that at the time of the resignation of the Guardian Trust Company as trustee under the trust agreement, and the appointment of the plaintiff as succeeding trustee, no instrument or instruments of assignment or conveyance were made by the Guardian Trust Company to the plaintiff. The defendant argues that therefore the plaintiff acquired no title to the rights which had been assigned by the syndicate managers to the Guardian Trust Company. I agree with the plaintiff that no assignment was necessary. The terms of the trust agreement provided for the resignation of the trustee and the appointment of a successor to fill the vacancy by an instrument, or instruments, ex-

ecuted by the holder of the note secured by the trust agreement, or the owners of a majority in interest therein. The trust agreement further provided that:

"Any new trustee or trustees appointed hereunder shall, upon their, his, or its appointment, and without any further act, deed, or conveyance, become and be vested with the possession of the property and securities hereby pledged and assigned, and intended so to be, and all other property or securities then held by the trustee hereunder, and all of the estates, trusts, rights, powers, and duties of the trustee in whose place they, he, or it shall have been appointed."

The appointment of the plaintiff conformed to all of the requirements of the trust agreement, and by the terms of it he succeeded to all the rights of the Guardian Trust Company, including the right to enforce through proper tribunals the obligations incurred by the defendant's subscription. It seems to be well settled that, if the instrument of trust provides for the vesting of the estate in the new trustee, upon the resignation and appointment of the succeeding trustee, the trust estate will vest according to the provisions of the instrument "as the creator of the trust may mould it at his pleasure." Perry on Trusts and Trustees (6th Ed.) § 284; National Webster Bank v. Eldridge, 115 Mass. 424; 39 Cyc. 271.

3. I find further from the evidence in the case at bar that $290,000 face value of participation certificates were issued by the Guardian Trust Company to McElhiney, president of the Refugio Syndicate, and Bryant, a business associate of McElhiney, which certificates, with the possible exception of one certificate for $8,000, issued to McElhiney, were hypothecated with different banking institutions to secure loans made to McElhiney and Bryant. It is impossible to make a definite finding that all the money borrowed by these certificate holders reached the treasury of the Refugio Syndicate. I do find that $230,000 of their borrowings were paid into the account of the Refugio Syndicate. It is a fair inference from the evidence that some of these certificates were used by McElhiney and Bryant for their own personal benefit, and the proceeds never found their way into the Refugio Syndicate. Other certificates were issued without consideration, but were ultimately acquired by the Refugio Syndicate and never presented for payment. $15,000 of certificates were issued for an option on stock acquired by the Refugio Syndicate. But, of the total amount of $538,500 of participation certificates issued by the Guardian

Trust Company, $128,600 were issued to holders who paid in cash the full face value of the certificates.

It is the contention of the defendant that the case at bar should be distinguished from the Sedgwick Case, because there is no finding that all the money received from the participation certificates was paid to the Refugio Syndicate; in other words, that the plaintiff is not entitled to recover unless he shows that the proceeds derived from all participation certificates were turned over to the Refugio Syndicate. It is true that, in the last opinion of the appellate court in the Sedgwick Case, the court had occasion to observe more than once that the proceeds of the borrowing upon the certificates had gone into the hands of the Refugio Syndicate; but I do not read the opinion to mean it is necessary for the plaintiff to show that all of the money went into the treasury of the corporation in order to entitle the plaintiff to recover. The evidence clearly warrants the conclusion that a very substantial portion of the money realized from the participation certificates was turned over to the Refugio Syndicate. It follows from this fact that on September 28, 1910, at the time of the formal cancellation of the outstanding participation certificates, the Refugio Syndicate acquired interests in the $800,000 note to the extent of the borrowings thereon, so far as such borrowings were represented by certificates legally and properly issued.

As I understand the opinion of the Circuit Court of Appeals, this is sufficient to entitle the plaintiff to recover the full amount of the subscription. If it should appear, whenever the plaintiff is required to account to his beneficiaries, that he has paid to his client, the Consolidated Gold Fields, sums in excess of the interest acquired by the Refugio Syndicate on September 28, 1910, he will then have to account to the syndicate managers or to the subscribers for such excess. I take it this is not the time to determine to what extent the participation certificates were legally and properly issued, or to exactly define the interests acquired by the Refugio Syndicate at the time they received $300,000 from the Consolidated Gold Fields for the purpose of paying off outstanding certificates. For that reason I am inclined to avoid an express finding respecting the amount actually paid in to the Refugio Syndicate, especially in view of the incomplete and meager evidence before me on that issue. Furthermore, the trustee would have the right to recover for the benefit of the $26,400 of certificates issued by the Refugio Syndicate, the holders of which were among

those who paid cash for the certificates which was covered into the treasury of the syndicate. Wing v. Sedgwick (C. C. A.) 4 F.(2d) at page 179.

The defendant contends, furthermore, on this showing of fact, that the borrowings were not borrowings of the syndicate managers, but rather borrowings by the Refugio Syndicate, and therefore beyond the power of the syndicate managers.

It has always seemed to me, as it did to Judge Morton (244 F. 205), that the borrowing under the deposit agreement was a borrowing by the Refugio Syndicate, and not a borrowing by the syndicate managers contemplated by the subscription agreement; but a majority of the Circuit Court of Appeals has held otherwise, remarking that it was a borrowing by the managers through the Refugio Syndicate. If that were so in Wing v. Sedgwick, it must be held as a matter of law to be still true in the case at bar, at least to the extent of certificates lawfully issued, and, for the reasons above suggested, the fact that some of the certificates may not have been lawfully issued would not defeat the plaintiff's right to recover.

[3] 4. The defendant in this case renews the argument advanced by Sedgwick that the subscriptions to the underwriting agreement were induced by fraud and misrepresentation, and therefore void. In the Sedgwick Case I found that the defendant had not established this defense of fraud. The evidence offered in the Sedgwick Case was, by stipulation, before me in the case at bar.

The defendant, McCallum, has introduced additional evidence, and earnestly argued that this accumulation of evidence warrants a finding favorable to the defendant upon the issue of fraud.

It may not be out of place in this connection to briefly outline the venture upon which the subscribers to the syndicate agreement embarked. The Refugio Syndicate held, under contracts of purchase or options, mining rights in Mexico, and, in order to preserve these rights, it was necessary to make certain periodical payments on account of the purchase price. Funds for this purpose were to be raised by increasing the capital stock of the Refugio Syndicate, by underwriting $800,000 of this increased stock, by borrowing on pledge of the underwriting agreement, and, if necessary, by calling upon the underwriters to pay a portion or all of the amount subscribed. According to the plan, as conceived by the promoters of the enterprise, the Refugio Syndicate was to sell its mining rights to a new corporation to be formed with a capital stock of several million dollars, divided into preferred and common stock. The Securities Corporation, Limited, in which McElhiney, Bryant, and others were interested, was to undertake the sale of this stock, and out of the proceeds funds were to be derived sufficient, not only to complete the acquisition of the properties and to work the mines, but also to liquidate all outstanding certificates of participation, and to reimburse the underwriters for the installments which they had been called upon to pay. If the plan of the promoters had been realized, the subscribers would also have participated in a stock dividend, consisting of common stock of the operating company.

A new corporation was organized, known as the Oro Grande Mines Company, with an authorized capital stock of $17,000,000, later reduced to $9,250,000; the Refugio Syndicate transferred to the Oro Grande Mines Company the property rights in Mexico and received therefor capital stock of the latter company.

Whether, because the Securities Corporation, Limited, was unable to market the Oro Grande stock, or because of some other cause, the anticipated funds were never forthcoming, and in order to meet the outstanding participation certificates the Refugio Syndicate resorted to the loan from the Consolidated Gold Fields of South Africa, Limited, above noted.

The evidence before me in the case at bar tends to strengthen the belief that the corporate affairs of the Refugio Syndicate were not managed with discretion, nor always with a view of promoting the interests of the stockholders of that company.

The evidence tends to show diversion of corporate funds to other than the purposes of the corporation. No doubt mismanagement of the affairs of the Refugio Syndicate contributed to the failure to achieve the end contemplated by the promoters and underwriters. So far as the record discloses, only about one-half of the sum received by the Refugio Syndicate from the sale of the participation certificates was ever used in Mexico for the preservation of the rights in the Mexican mines. It may be that payments on account of purchase price for some of the properties were made in New York. There is no evidence before me which enables me to determine this point one way or the other. If the mismanagement and misconduct of the officers of the Refugio Syndicate amounted to a fraud upon the stockholders (and upon this I make no express finding), such fraud was necessarily perpetrated after the underwriting agree-

ment had been executed, and could not possibly operate to avoid the obligation then assumed by the underwriters.

The defendant stresses the point that the plaintiff has been unable to satisfy judgments which have been recovered against McElhiney, Bryant, and other subscribers to the syndicate agreement who were actively interested in promoting the undertaking; but these judgments were obtained many years after the syndicate agreement was signed. These subscribers paid their first and second installments on their subscription, and their inability to meet the balance falls far short of proving that their subscriptions were not genuine and made in good faith. Moreover, there is no evidence that any of these subscribers made any representations to defendant about their financial resources.

I have reached the conclusion, therefore, that the new evidence, together with that received in the earlier case, is not sufficient to warrant me in reaching a result different from that reached in the Sedgwick Case.

I find and rule in this case that the defendant has not established his defense of fraud.

All the other defenses set up in defendant's answer are concluded by the prior adjudications of this court in Wing v. Sedgwick, and no useful purpose would be served by reviewing the same.

I have only considered those alleged defenses which may be said to rest upon facts not developed in Wing v. Sedgwick, or were not pressed in that case. Nothing new has been developed, which will defeat the plaintiff's rights to recover in full the balance of defendant's subscription, in view of the conclusions already reached by the Circuit Court of Appeals for this circuit in the earlier case.

The plaintiff claims to be entitled to interest on $46,000, the full amount of the subscription, from March 1, 1909, to July 15, 1909, when the first installment of 12½ per cent. was credited. I understand this claim is disputed. By the terms of the underwriting agreement the subscribers agreed to make cash payments on account of their respective subscriptions upon call, provided no call should be made prior to January 1, 1909. After that date, calls were to be payable upon 30 days' notice.

On January 27, 1909, the syndicate managers formally demanded of the defendant payment of the full amount of his subscription on or before March 1, 1909. He did not pay his subscription, and on July 15, 1909, a call of 12½ per cent. of the amount was made. At this time the syndicate managers advised that "circumstances have transpired which the syndicate managers have taken advantage of, thus obviating the necessity of enforcing the full amount of the first call at this time."

It is clear, from the communication of January 27, 1909, that the syndicate managers intended to, and did, comply with the terms of the syndicate agreement, so far as required, to fix the time when the subscription should become due and payable. The date thus fixed was March 1, 1909. After that date the defendant was in default. The syndicate managers subsequently elected not to enforce the payment of the full amount of the subscription, first asking for 12½ per cent., and later requesting another 12½ per cent. These were not calls made for the purpose of fixing the date of payment, but were more in the nature of requests made upon the subscriber to discharge in part his obligation. I am not satisfied from the evidence that the syndicate managers, in making the subsequent requests, intended to postpone the date when the subscription should become payable under the terms of the subscription agreement, or to waive any rights which had accrued as a result of the formal call made upon subscribers on January 27, 1909. I am prepared, therefore, to adopt the plaintiff's computation of interest.

I find and rule that the plaintiff is entitled to recover in this action $71,492.62, together with interest on $34,500 from October 18, 1926, to date of judgment.