### WING v. SEDGWICK.

### SAME v. McCALLUM.

(Circuit Court of Appeals, First Circuit. October 3, 1918. Petition for Rehearing, December 11, 1918.)

#### Nos. 1334, 1335.

1. CORPORATIONS ⟨⇔⟩109(1)—SUBSCRIPTIONS TO STOCK—CONSTRUCTION OF CONTRACT.

Authority given syndicate managers by each several signer of an underwriting agreement for the stock of a corporation to borrow money to the amount of his subscription, to make immediate payment for the stock, "upon such terms" as they might be able to arrange with the lenders, and to pledge the agreement as security, *held* broad enough to empower them to execute their note to the corporation and to deposit the agreement with a trustee as collateral.

2. CORPORATIONS ⟨⇔⟩92—CAPITAL STOCK—LEGALITY OF ISSUE.

Under General Corporation Law N. J. § 48, providing that nothing but money shall be considered as payment for capital stock of a corporation, except in case of purchase of property, where a note was made to a corporation in which it sold participation certificates for cash, stock issued to the amount of such cash was full-paid and valid.

⟨⇔⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. CORPORATIONS ⬅148(2)—STOCK UNDERWRITING AGREEMENT—CONSTRUC-
TION.

Where an underwriting agreement for stock of a corporation author-
ized syndicate managers to borrow money to pay for the stock, and to
pledge the agreement as security, "without the duty on the part of such
lender to inquire into the performance by the syndicate managers of any
of their obligations hereunder," the rights of lenders could not be
affected by the fact that the money borrowed was not all applied to the
purchase of stock.

4. CORPORATIONS ⬅123(10)—STOCK UNDERWRITING AGREEMENT—ACTION BY
PLEDGEE.

The declaration in an action by a trustee on an underwriting agree-
ment for stock of a corporation, which in accordance with its terms was
pledged with plaintiff to secure a note in which participation certifi-
cates were issued and sold, *held* to state a cause of action in favor of the
holders of such certificates.

In Error to the District Court of the United States for the District
of Massachusetts; James M. Morton, Jr., Judge.

Actions by Thomas E. Wing, trustee, against Alexander Sedgwick
and against Alexander McCallum. Judgments for defendants (244
Fed. 199), and plaintiff brings error. Judgments vacated, and cases
remanded.

Burt D. Whedon, of New York City (Philip W. Russell and Wing &
Russell, all of New York City, and C. A. Hight and Coolidge & Hight,
all of Boston, Mass., on the brief), for plaintiff in error.

Hector M. Hitchings, of New York City, and William R. Sears,
of Boston, Mass. (Whipple, Sears & Ogden, of Boston, Mass., on
the brief), for defendants in error.

Before BINGHAM and JOHNSON, Circuit Judges, and BROWN,
District Judge.

BINGHAM, Circuit Judge. These are writs of error from judg-
ments in favor of the defendants in the United States District Court
for Massachusetts upon demurrers to declarations. Each action was
brought against an underwriter to recover his individual subscrip-
tion to an underwriting agreement which was pledged with the plain-
tiff, as trustee, to secure a certain loan or loans provided for in the
underwriting agreement, as will hereafter more particularly appear.

The declarations in each action were the same, the only difference
being in the amount of the individual underwriter's subscription and
the sums due thereon. In No. 1334 it was alleged: (1) That the
plaintiff was a citizen of the state of New York; (2) that the defend-
ant was a citizen of Massachusetts; (3) that on or about the 1st day
of September, 1907, the defendant, desiring to provide for the pur-
chase of certain shares of the capital stock of the Refugio Syndicate,
a New Jersey corporation, made a contract, in writing, with George
W. McElhiney and Ernest A. Wiltsee, called therein "syndicate
managers," whereby the defendant undertook to pay $9,200 to the
said McElhiney and Wiltsee as such syndicate managers, at the times
and upon the terms and conditions therein set out (a copy of the con-
tract, marked "Schedule A," was annexed to the declaration and

made a part thereof); that within 90 days from the date of said contract subscriptions to the amount of at least $500,000 were made thereto, so that the said contract, in accordance with its terms, became binding and effective, and thereafter subscriptions to the full amount of $800,000 were made to said contract; (4) that thereafter, and pursuant to the contract (Schedule A), and to carry out the purpose and provisions thereof, the said McElhiney and Wiltsee subscribed as such syndicate managers, and agreed to take and pay for 8,000 shares, of the par value of $100 each, of the capital stock of Refugio Syndicate; (5) that the said syndicate managers, being by the contract (Schedule A) authorized to borrow the sum of $800,000 and to incur a liability for the interest thereon as such syndicate managers, for the purpose of paying for the aforesaid stock so subscribed for, did, pursuant to the terms of said contract, make and execute and deliver, as syndicate managers, their promissory note, payable on March 1, 1909, to bearer, for the sum of $800,000, and said syndicate managers, as therein authorized, pledged said contract (Schedule A) as collateral security for the payment of their said note, together with the capital stock of Refugio Syndicate held by them as syndicate managers, with the Guardian Trust Company of New York, as trustee under a certain agreement in writing dated March 2, 1908, a copy of which is annexed hereto, made a part hereof, and marked "Schedule B"; that the aforesaid note was duly certified by the trustee in accordance with the provisions of said Schedule B; (6) that on the same day, to wit, March 2, 1908, Refugio Syndicate, desiring to realize upon the said $800,000 note before the date of its maturity, in accordance with a plan and agreement arrived at between it and the said syndicate managers before the execution and delivery of said note under which participations in said note could be advantageously sold, made an agreement in writing with the Guardian Trust Company of New York, under which agreement it deposited with the Guardian Trust Company of New York the said $800,000 note and provided for the issue by the said Guardian Trust Company of New York of certificates of participation in said note to purchasers thereof (a copy of the agreement, called the "deposit agreement," marked "Schedule C," was annexed to the declaration, and made a part thereof); (7) that after January 1, 1909, and at least 30 days prior to March 1, 1909, the syndicate managers called upon defendant to pay on March 1, 1909, the amount agreed to be paid by him in his said contract (Schedule A); (8) that the defendant failed and refused, and still refuses, to pay the said amount, except the sum of $1,150 on or about July 15, 1909, and the sum of $1,150 on or about March 18, 1910; (9) that on March 1, 1909, the aforesaid note for $800,000 matured, was duly presented for payment, and was not paid, and is still unpaid; (10) that on or about the 28th day of September, 1910, there were outstanding certain participations in the said $800,000 note, and at that time, by agreement between the Guardian Trust Company of New York, Refugio Syndicate, and the holders of such outstanding participation certificates, the so-called deposit agreement, a copy of which is marked "Schedule C," was canceled, and the said $800,-000 note was redelivered by the Guardian Trust Company of New

York to Refugio Syndicate, and the then holders of participations therein accepted from Refugio Syndicate its certificates of participation in the place and stead of certificates of participation theretofore issued to them by the Guardian Trust Company of New York; (11) that on September 28, 1910, the Guardian Trust Company of New York, by instrument in writing and in accordance with the provisions of agreement, Schedule B, resigned as trustee, which said resignation was duly accepted and consented to, and upon the same day, to wit, September 28, 1910, the plaintiff was duly appointed trustee in the place of Guardian Trust Company of New York, duly qualified as substituted trustee, and is now, and ever since has been, acting as such substituted trustee; (12) that on September 28, 1910, Consolidated Gold Fields of South Africa, Limited, a corporation duly organized and existing under the laws of the kingdom of Great Britain, loaned to said Refugio Syndicate the sum of $300,000 upon the promissory note of said Refugio Syndicate dated the same day, wherein it promised to pay the sum of $300,000 to Consolidated Gold Fields of South Africa, Limited, on or before one year from date thereof; (13) that as collateral security for the payment of said note, said Refugio Syndicate delivered to said Consolidated Gold Fields of South Africa, Limited, the said $800,000 note of the syndicate managers (subject to outstanding participations therein), which said note was, and still is, secured by the trust agreement, Schedule B, hereto annexed; (14) that on October 25, 1911, the said $300,000 note of Refugio Syndicate being past due and unpaid, Consolidated Gold Fields of South Africa, Limited, sold the said $800,000 note of the syndicate managers at public auction in the city of New York, and the same was bid in by James McDougall, the highest bidder, at such sale, for the account of said Consolidated Gold Fields of South Africa, Limited, the present owner and holder of said note, subject to the said outstanding participations therein; (15) that the plaintiff has at all times since September 28, 1910, been ready, able, and willing, and he hereby offers, to transfer and deliver to defendant upon payment of the balance due under his said agreement (Schedule A) the amount of stock in Refugio Syndicate which, under paragraph second of said agreement, he is entitled to receive; (16) that the payment of the amount due and owing as alleged in paragraphs seventh and eighth herein—namely, $6,900—was further demanded of the defendant by the plaintiff, duly acting as trustee for the holders of the aforesaid note and participations therein (for whose benefit this suit is brought) on November 1, 1911, but no part thereof has been paid; (17) that all the acts of said syndicate managers in connection with the making and delivery of their said $800,000 note to Refugio Syndicate, the pledging of the contract (Schedule A) and the stock of Refugio Syndicate as security for said note with Guardian Trust Company under the agreement, Schedule B, and the deposit of said note by Refugio Syndicate with Guardian Trust Company and the issuance and sale of participations therein under the agreement, Schedule C, were done with the full knowledge and consent of the defendant, who afterwards ratified and approved the same.

The grounds of demurrer assigned by the defendant are: (1) The

declaration does not state a legal cause of action; (2) that it fails to state a legal cause of action substantially in accordance with the provisions of chapter 173 of the Revised Laws of Massachusetts; (3) that it fails to state a legal cause of action for the reason that it appears therefrom that the plaintiff brings the same as trustee appointed in the place of Guardian Trust Company of New York under an alleged agreement or agreements, and that it appears from said declaration that upon the same day upon which the plaintiff alleges that he was appointed the agreement or agreements aforesaid were canceled and a certain $800,000 note therein dealt with was delivered up, so that it appears that from and after said 28th day of September, 1910, it was impossible for the plaintiff to be trustee by reason of said agreement or agreements, or otherwise, in the premises, so that he has no standing to bring this action; (4) that it fails to state a legal cause of action for the reason that it appears therefrom that the plaintiff brings the same as trustee appointed in place of Guardian Trust Company of New York under an alleged agreement or agreements, and that it also appears from said declaration that Guardian Trust Company had sold the $800,000 underwriting agreement, therein referred to, to Consolidated Gold Fields Company, Limited, therein mentioned, and that by and through said sale it had parted with all power over said underwriting agreement and with all power or right to sue on the same, so that it appears that the plaintiff could have no power as its successor to bring suit thereon.

We do not find it necessary to say more with reference to the third and fourth grounds of demurrer than that they are not well founded in fact. The declaration does not set forth, as the defendant states, that upon the same day upon which the plaintiff was appointed trustee the trust agreement, under which his appointment was effected, was canceled. Nor is it alleged in the declaration that the Guardian Trust Company of New York, which preceded the plaintiff as trustee, had sold the underwriting agreement to the Consolidated Company prior to plaintiff's appointment. The sole question, therefore, is whether the declaration states a legal cause of action.

[1] The action is brought upon the underwriting agreement of September 1, 1907, which was entered into between McElhiney and Wiltsee as syndicate managers and the defendant and others as underwriters. In this agreement it appears that a corporation known as the "Refugio Syndicate," having an authorized capital stock of $1,000,000, consisting of 10,000 shares of the par value of $100, had been organized under the laws of New Jersey; that each underwriter had paid for and owned such proportion of 2,000 shares of the stock of the company as his subscription to the underwriting agreement bore to the total subscriptions thereto; that the underwriters were desirous of providing for the purchase of the remaining 8,000 shares of the stock, and in view of that entered into the agreement whereby they appointed the syndicate managers their agents, with certain powers as to borrowing money and as to pledging securities therefor. In this agreement each underwriter bound himself to assign to the managers the number of shares of stock then owned by him in the 2,000 shares previously purchased, and to receive therefor from the

managers a certificate showing his interest in the syndicate. He also agreed to pay the amount of his subscription as it appeared upon the contract, and was to receive for each $800 of his subscription "$1,000 face value in said capital stock." The subscription of each underwriter was to be paid in cash upon the call of the managers, and indorsed on the aforesaid certificates of interest, but no call was to be made prior to January 1, 1909, except in a certain case not necessary to mention. After January 1, 1909, calls were payable upon 30 days' notice. Each subscriber severally, and not jointly, authorized the managers to borrow from any lender or lenders "a sum not to exceed in principal indebtedness his cash subscription" for such period as would make the same due not earlier than March 1, 1909, and "upon such terms" as the managers should be able to arrange with the lenders, and to secure such loan or loans each subscriber severally authorized the managers to pledge therefor his subscription to the underwriting agreement duly assigned, his shares of the stock previously paid for and the new capital stock therein underwritten. It was also provided that the note or obligations of the managers should be binding upon the underwriters in favor of the lender or its assigns, without the duty on the part of such lender to inquire into the performance by the managers of any of their obligations thereunder. The managers were authorized, upon the written approval of a majority in interest of the underwriters, to sell the whole or any part of the stock for cash at 125 per cent. of its par value, but in case they did not sell the same prior to March 1, 1909, then said stock, upon full payment in cash of the underwriters' subscriptions, was to be divided among the underwriters. In case of the default of an underwriter in the performance of any of his agreements the managers had the right to exclude him from further interest in the underwriting agreement and to forfeit any payment he may have made thereunder, and in case of default in the payment of any amount agreed to be paid by the underwriter thereunder, the lender or lenders had the right to sell the stock pledged at public or private sale, and the proceeds, after payment of the expenses incident to the sale, were to be applied by the lender to the payment of the obligation of the defaulting underwriter, who was to remain liable for any deficiency. The agreement was not to become binding unless subscriptions to the amount of $500,-000 were made within 90 days from its date. The managers were to have the sole direction, management, and conduct of the syndicate, and the enumeration of particular or specific powers was not to be considered as in any way limiting or abridging the general power or discretion intended to be conferred upon and reserved to them for the purposes of the agreement.

According to the allegations of the declaration, the managers, having entered into the foregoing contract, in pursuance thereof and for the purpose of carrying it into effect, subscribed and agreed to pay for 8,000 shares of the stock of Refugio Syndicate. Thereafter, on March 2, 1908, they made their promissory note for $800,000, payable to bearer March 1, 1909, and delivered the same to Refugio Syndicate for the purpose of paying for said stock in accordance with a plan and agreement between them and the company entered into be-

fore the delivery thereof, whereby participations in said note could be sold and sums realized for the payment of the stock, and as collateral to the note and the borrowing thereon, they pledged with the Guardian Trust Company of New York, as trustee under a trust agreement of the same date, to wit, March 2, 1908, the underwriting agreement, Schedule A, and all of the capital stock of the Refugio Syndicate (the terms of the pledge are set out in the trust agreement, Schedule B), and that on the same day, to wit, March 2, 1908, the Refugio Syndicate, in accordance with the plan and agreement arrived at between it and the managers before the execution and delivery of the note under which participations in said note could be advantageously sold, made an agreement with the Guardian Trust Company of New York under which it deposited with the Trust Company the $800,000 note and provided for the issue by the Trust Company of participation certificates in the note to purchasers thereof (this is the deposit agreement, Schedule C).

[2] The chief contentions of the defendant are that the arrangement, under which the $800,000 note was deposited by the managers through the Refugio Syndicate with the Trust Company and the issuance of participation certificates thereon, was not a borrowing within the powers conferred upon the managers under the underwriting agreement, Schedule A, and consequently the pledging of the underwriting agreement and of the stock was unauthorized within the terms of that agreement, and further that, inasmuch as the general corporation law of New Jersey (section 48), under the laws of which state the Refugio Syndicate corporation was organized, provided that "nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under this act, except as hereinafter provided in case of the purchase of property," the stock issued was illegal, and was not a consideration for the note or the borrowings obtained through the participation certificates issued thereon, that the stock was not only illegally issued, but that it was not full-paid stock, and that the underwriting agreement contemplated that the defendant's liability to pay his underwriting subscription was conditioned upon his receiving full-paid stock legally issued.

We have heretofore pointed out that, by the underwriting agreement, each subscriber for himself, and not jointly, authorized the managers to borrow for him a sum not to exceed "in principal indebtedness" his subscription, and that it was within their discretion to determine whether the borrowing should be on a single note for $800,000 or on notes for different amounts in the aggregate not exceeding $800,000, and that in either event the liability of an individual underwriter therefor should not exceed in principal indebtedness his individual subscription, and that they were not confined to any particular method of borrowing. The declaration alleges that participation certificates in the $800,000 note were issued by the Guardian Trust Company to the Refugio Syndicate, under which borrowings were had, and that the suit was brought by the trustee for the benefit of the holders of the participations and the note. Such being the case, we are of the opinion that, so far as money was obtained on participation certificates by the Refugio Company under the arrangement above set forth,

borrowings were made by the managers within the terms of the underwriting agreement, and that the stock issued by the Refugio Syndicate to an amount equivalent to the money thus received was full-paid stock.

But the defendant says that the managers were not authorized by the underwriting agreement, Schedule A, to pledge the underwriting subscriptions and the stock with the Guardian Trust Company as trustee in the manner and according to the terms provided in the trust agreement, Schedule B; that the underwriting agreement only contemplated a pledge to the lender or lenders, and not the payment of expenses of a trustee for rendering services as provided for in the trust agreement, Schedule B. The underwriting agreement, however, authorized the managers to borrow on behalf of each underwriter "upon such terms as the syndicate managers may be able to arrange with the lenders," and to pledge for "said loan or loans his subscription hereto duly assigned to the satisfaction of the lender or lenders," and also the capital stock. As they were authorized by each underwriter to borrow "a sum not to exceed in principal indebtedness his cash subscription" (in the aggregate $800,000), in such sums and from such number of lenders as they deemed best, and "upon such terms as they were able to arrange with the lenders," and to pledge the securities in a manner "to the satisfaction of the lender or lenders," it cannot be doubted but that the parties contemplated a trustee might be appointed with whom the securities might be pledged to secure the loan or loans, and that provision might be made for paying the trustee for his services.

[3] It is evident that the underwriters hoped and expected to receive full-paid stock on payment of their subscriptions, but it is equally evident that their hopes and expectations were based upon their confidence in their agents, the managers, in seeing that the money raised through the borrowings reached the hands of the Refugio Syndicate; for they expressly stipulated in their underwriting agreement, that "the note or other obligations of the syndicate managers shall be binding upon the subscribers and their assigns in favor of the lender and its assigns, and without the duty on the part of such lender to inquire into the performance by the syndicate managers of any of their obligations hereunder." The lenders being under no obligation to see that the money borrowed was applied to the payment of the stock, the underwriter's obligation to pay his subscription was not conditioned upon his receiving full-paid stock.

It is alleged that on September 28, 1910, the Guardian Trust Company resigned as trustee and that the plaintiff was duly appointed in its place. Article 13 of the trust agreement, Schedule B, provided for and authorized such action, and rightly, as we think, within the contemplation of the underwriting agreement.

It is further alleged that on September 28, 1910, by agreement between the Guardian Trust Company, the Refugio Syndicate and the holders of the then outstanding participation certificates, the deposit agreement, Schedule C, was canceled, and the $800,000 note was turned over to the Refugio Syndicate, and that the Refugio Syndicate then issued, in exchange for participations then outstanding, its partici-

pation certificates. It is not alleged that the cancellation of the deposit agreement was with the agreement and consent of the managers who were the agents of the underwriters. It would seem that, inasmuch as the deposit agreement, under which the note was deposited with the trustee and the participations were issued, was authorized by the managers, and their authorization was essential to constitute a borrowing by them under the authority conferred by the underwriting agreement, its cancellation in the absence of their consent could not have been effected. Its attempted cancellation, however, would not affect the rights of the then holders of outstanding participations to the extent that they had advanced money on the certificates.

[4] It is further alleged that, after the cancellation of the deposit agreement, Schedule C, the Refugio Syndicate borrowed $300,000 of the Consolidated Gold Fields Company and pledged the $800,000 note, subject, however, to the participations then outstanding, to secure said loan; that this note not having been paid, the Gold Fields Company sold the $800,000 note at public auction for the purpose of foreclosing the security, and became the purchaser at the sale. This transaction, to the extent that borrowings were had on the $800,000 note, if entered into with the consent of the managers and for the purpose of paying for the stock, would not contravene the authority conferred upon them by the underwriting agreement, but, to the extent that it put it in the power of the Gold Fields Company to acquire an interest in the $800,000 note beyond the sum so loaned, it would be in contravention of the underwriters' agreement, and, whether done with or without the consent of the managers and for the purpose of paying for the stock, the Gold Fields Company would acquire nothing in the $800,000 note, over and above the sum actually loaned. It is not alleged, however, that the $300,000 was borrowed to pay for the stock and with the managers' consent. In the absence of such allegations this loan could not be regarded as a borrowing by the managers within the contemplation of the underwriting agreement, and the underwriting subscriptions would not be collateral thereto. While we think the declaration does not state a cause of action as to the $300,000 loan, we are of the opinion that it does state one in so far as recovery is sought in behalf of the owners, legal or equitable, of participation certificates issued for sums loaned upon them.

The defendant Sedgwick's subscription was for $9,200, and the managers were authorized to borrow for him that amount, and, as by the terms of the underwriting agreement he bound himself to pay that sum, we think the plaintiff is entitled to recover the same, less the payments he had made; but, inasmuch as it is apparent that the borrowings had did not equal the sum of $800,000, the plaintiff would be bound to hold and pay over to the managers for the Refugio Syndicate such part of the sum recovered as exceeded the amount required to pay Sedgwick's proportionate part of the borrowings actually made. We also think Sedgwick is bound to pay the interest on his proportionate part of the loan and his proportionate part of the reasonable expenses incurred by the trustee, the managers having been authorized to fix the terms of the borrowing and pledge.

It does not seem to us that the New Jersey statute prevents the

plaintiff from maintaining this action. If it be assumed that the stock was illegally issued, that would not invalidate the underwriting agreement for that agreement did not contemplate the procurement of an illegal issue of stock. The lenders had nothing to do with the procurement of the stock or with seeing that it was legally issued. This was a matter that the underwriter intrusted to the managers, and the lenders, through the trustee, were bound only to turn over, on the payment of his subscription, the underwriter's proportionate part of the stock pledged.

What we have said as to No. 1334 applies with equal force to No. 1335. The demurrers in each action must be overruled.

The judgments of the District Court are vacated, and the cases are remanded to that court for further proceedings not inconsistent with this opinion, with costs to the plaintiffs in error.

### On Petition for Rehearing.

PER CURIAM. In our opinion handed down the 3d day of October, 1918, the questions intended to be decided were only such as were raised by the demurrer to the declaration. No question was presented, or could have been presented, as the pleadings then stood, as to whether the defendant had a defense which he might set up to defeat the plaintiff's right to recover any surplus due on Sedgwick's underwriting agreement over and above the amount borrowed on participation certificates for his benefit, and nothing in our opinion precludes him from making such defense. The declaration stated a prima facie case entitling the plaintiff to recover the full amount of the subscription, holding the surplus, if any, for the benefit of the managers or the Refugio Syndicate, and this is all that was meant by the passages in our opinion referred to in the defendant's petition for rehearing.

The plaintiff's declaration alleged that Sedgwick's underwriting subscription was for $9,200, and that he had paid thereon the sum of $2,300. It did not appear how many certificates of participation were outstanding or the amount held by Sedgwick, and we did not consider his right to set them up as a defense to the action.

What is here said with reference to Sedgwick applies with equal force to McCallum.

The petition for rehearing is denied.