## WING v. SEDGWICK.

(Circuit Court of Appeals, First Circuit.
March 10, 1925, as Amended April
21, 1925.)

### No. 1787.

**Corporations ⬤⟞79—Member of underwriting syndicate held liable for subscribed stock.**

Where underwriting agreement authorized syndicate managers to borrow money for payment of corporate stock subscribed for by members, and managers executed note to corporation for stock and deposited agreement with trustee as collateral for payment of note, in which certificates of participation were issued, and on nonpayment of sufficient subscriptions to extinguish note corporation executed note to third party, secured by such manager's note, from proceeds of which participation certificates were paid substituted trustee *held* entitled to recover from member on his stock subscription.

Anderson, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts; Elisha H. Brewster, Judge.

Action by Thomas E. Wing, trustee, against Alexander Sedgwick. Judgment for defendant (299 F. 311), and plaintiff brings error. Vacated and remanded, with directions.

Burt D. Whedon, of New York City (G. S. Selfridge, of Boston, Mass., and Wing & Russell, of New York City, on the brief), for plaintiff in error.

Hector M. Hitchings, of New York City (Hugh W. Ogden, of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is the same case that was previously before this court (254 F. 5, 165 C. C. A. 415) on a writ of error from a judgment in favor of the defendant sustaining a demurrer to the plaintiff's declaration.

We then held that the arrangement under which the $800,000 note was deposited by the managers through the Refugio Syndicate with the Guardian Trust Company for the issuance of participation certificates therein was an authorized method of borrowing within the powers conferred upon the managers by the underwriting agreement (Old Record, Schedule A; Present Record, Exhibit 1) of September 1, 1907, and consequently the pledging of the underwriting agreement and all the stock was authorized within the terms of that agreement, and that the underwriting agreement was not conditioned

upon the subscribers receiving full paid stock legally issued; that the lenders, through the trustee, were bound only to turn over to the defendant, on payment of his subscription, his proportionate part of the stock pledged, whether that stock was full paid stock legally issued or not; and that, if borrowings were had on the $800,000 note pursuant to the deposit and pledge, as alleged in the declaration, the defendant having defaulted, the trustee would be entitled to recover from the defendant on the subscription agreement the $9,200 which he had subscribed, less the payments he had made; but that, as it was apparent that the borrowings had did not equal the sum of $800,000, the plaintiff would be bound to hold and pay over to the managers for the Refugio Syndicate such part of the sum recovered as exceeded the sum required to pay the defendant's part of the borrowings actually made.

This decision having been rendered, the case was remanded to the District Court for trial, where, after trial before the district judge, a jury having been waived, facts were found and rulings of law were made, to which the plaintiff excepted, and, judgment for the defendant having been entered thereon, this writ of error was prosecuted.

This action is brought by the plaintiff, as trustee, on a syndicate underwriting agreement for 8,000 shares of stock, par value of $100 each, of the Refugio Syndicate, a New Jersey corporation, against the defendant as a subscriber thereto, wherein the defendant subscribed for and agreed to pay $9,200 for 92 shares of stock; the underwriting agreement, together with 2,000 shares of stock of the Refugio Syndicate previously purchased by the subscribers and paid for, having been pledged with the Guardian Trust Company as trustee to secure the note of $800,000 deposited with the trust company as depository, in which participations or borrowings were to be had to pay for the 8,000 shares.

The District Court has found that all the material facts alleged in the declaration are true except those alleged relating to ratification (paragraph 17 of the declaration), which, in view of further facts found, we regard as immaterial. As additional facts, it was found that, after the $800,000 note and collateral had been deposited with the Guardian Trust Company, it borrowed on participation certificates $538,500, the net proceeds of which the Refugio Syndicate received in payment for the stock as and when the certificates were issued; that by the payment of subscriptions this amount of partic-

ipations on September 28, 1910, had been reduced to $290,608; that on that date the $800,000 note was long overdue and the holders of participations were demanding payment; that to meet these demands the Refugio Syndicate entered into an arrangement to borrow from Consolidated Gold Fields of South Africa, Limited, $300,000 on its promissory note for that sum, dated September 28, 1910, which sum it turned over to the Guardian Trust Company; that the Guardian Trust Company applied $275,144.70 to cover the principal and interest on certain participation certificates then outstanding, amounting to $264,368, of the total outstanding certificates of $290,608; that nothing was paid on the balance of the outstanding certificates of $26,240; that the remainder of the $300,000 was turned back to the Refugio Syndicate; that certificates representing the total outstanding borrowings of $290,608 were turned over to the trust company and canceled, as was the deposit agreement of March 2, 1908; that the $800,000 note was delivered by the Guardian Trust Company to the Refugio Syndicate; that the holders of the $26,240 of participation certificates received in lieu thereof participation certificates for that sum in said note which were issued by the Refugio Syndicate; that on the same day and as a part of the same transaction the Refugio Syndicate delivered to Consolidated Gold Fields the note for $300,000 and as collateral security therefor the $800,000 note, subject to the $26,240 of outstanding participation certificates; that on the same date, September 28, 1910, the plaintiff was appointed trustee under the trust agreement of March 2, 1908, to succeed the Guardian Trust Company, which that day resigned; that, when the $300,000 note given to the Consolidated Gold Fields became due, it was not paid, and thereafter that company caused the $800,000 note held as collateral to be sold at public auction and bought in for its account.

Having found the material allegations of the declaration to have been proved and the additional facts as above stated, the District Court made the following rulings: (1) That on the foregoing facts the plaintiff was not entitled to recover in this action; (2) that the 8,000 shares of the capital stock of the Refugio Syndicate were never lawfully issued to the syndicate managers either on September 30, 1907, or any subsequent date; (3) that the underwriting agreement did not authorize the syndicate managers to issue the $800,000 note for 8,000 shares of the capital stock of the Refugio Syndicate; (4) that neither the Refugio Syndicate as holder of the $800,000 note nor the plaintiff as trustee can hold the subscribers to the underwriting agreement liable thereon; (5) that the loan of $300,000 by the Consolidated Gold Fields of South Africa, Limited, to the Refugio Syndicate upon the security of the $800,000 note of the syndicate managers as collateral did not constitute a borrowing by the managers within the contemplation of the underwriting agreement (Plaintiff's Exhibit 1), and said underwriting agreement is not enforceable as collateral to said loan; (6) that the plaintiff is not entitled to recover upon defendant's subscription agreement either for the benefit of Consolidated Gold Fields or for the holders of any participation certificates issued by the Refugio Syndicate.

It is to these rulings that error is assigned.

In view of the conclusions reached in our former decision we regard the second ruling of law as immaterial, for we there held that it would not be a defense to an action brought by the trustee on the underwriting agreement for the benefit of lenders on participation certificates whether the shares of stock of the Refugio Syndicate were full paid and lawfully issued or not. Neither do we regard the third ruling as material, for, if it be assumed that the underwriting agreement did not authorize the syndicate managers to give the $800,000 note in payment for the stock, it did authorize, as we previously held, the deposit of that note with the trust company, as depository, to represent borrowings that might be had to the amount of the note. Neither do we regard the fourth ruling as essential to a decision of this case, for this suit is not brought upon the $800,000 note by the Refugio Syndicate or by the plaintiff as trustee, but upon the underwriting agreement. The fifth ruling, in the view we take of the case, is likewise inapplicable. It is undoubtedly true that the loan of $300,000 by the Consolidated Gold Fields to the Refugio Syndicate upon the security of the $800,000 note as collateral was not in itself a borrowing by the managers within the contemplation of the underwriting agreement, but this tells only a small part of the story, for it appears that, on September 28, 1910, there were outstanding participation certificates, representing borrowings on the note, amounting to $290,608, to secure which the defendant's subscription agreement was pledged, the proceeds of which borrowings, at the time they were obtained, had gone into the hands of the Refugio Syndicate towards payment of the stock and to the credit of the subscribers, including the defendant; and that, while the transaction of Sep-

tember 28, 1910, was in form a cancellation of the outstanding participation certificates, it was in truth and in fact nothing more than an acquisition by the Refugio Syndicate of interests in the $800,000 note representing borrowings thereon amounting to $264,368 and a pledge thereof to the Consolidated Gold Fields as security for the $300,000 note. In this way the Refugio Syndicate became the equitable and probably the legal owner of the interests of a large majority of the holders of participations in the $800,000 note, which it assigned as collateral to the Consolidated Gold Fields, and which Consolidated Gold Fields later acquired by foreclosure. Then again the holders of the $26,240 worth of participation certificates, representing borrowings of that amount in the note, by surrendering those certificates and taking others representing like amounts of interest in the note, did not change their rights therein in any respect. That money had been loaned to the subscribers, and at their direction had, at the time it was received, gone to the payment of the stock The rights of these lenders were not extinguished by the formal cancellation of the old certificates, for it was clearly not their intention and could not have been to give up their interests in the $800,000 note amounting to $26,240, and discharge the subscribers from their obligation to pay the same, and what was done shows beyond question that they intended, and all the parties to the transaction intended, that they should retain their interests in the note to the extent that they had loaned their money to pay for the stock.

There was, then, at the time this suit was brought, as well as on September 28, 1910, outstanding interests or borrowings in the $800,000 note to which the defendant's underwriting subscription was collateral, and, as the note was then overdue, and the defendant had defaulted in the payment of his subscription, the plaintiff, as trustee, was in a position to maintain this action, and out of the sum recovered pay to the owners of the borrowings amounting to $290,608 and interest such part of the sum recovered as would be required to pay defendant's proportionate part of the borrowings, paying the balance to the Refugio Syndicate.

While the managers may not have been authorized by the underwriting agreement to give the $800,000 note to the Refugio Syndicate in payment for the stock, they were authorized thereby to make the note and cause it to be put into the hands of a depository to obtain borrowings thereon to pay for the stock, and, the borrowings having been had, the note continued to represent the sums borrowed until the subscribers or some one representing them extinguished them by payment. Here the loans have not been paid by the subscribers, whose obligation it is to pay them, nor by any one in their behalf, and there has been no novation substituting a new debtor.

The District Court seems to have entertained the view that, "when the participation certificates, issued by the Guardian Trust Company, had been surrendered, and the agreement under which they had been issued canceled," and "the note * * * redelivered to the Refugio Syndicate," that transaction "put the Refugio Syndicate in the same position it would have been if no participation certificates had ever been issued." This clearly is not so, for, in so far as borrowings were had on the $800,000 note to pay for the stock and the proceeds thereof came to the Refugio Syndicate, the stock which it issued was, to that extent at least, paid up and became the stock of the subscribers; and, this being so, the Refugio Syndicate, after the transaction of September 28, 1910, could not have been in the position that it would have been had no borrowings been had.

When the case was here before it did not appear in the allegations of the declaration that $275,144.70 of the sum borrowed by the Refugio Syndicate from the Consolidated Gold Fields went to take up outstanding participations in the note amounting, with interest, to that sum, and which had gone to pay for the stock, but we then expressed the opinion that the declaration stated a cause of action in so far as recovery was sought in behalf of the owners, legal or equitable, of participation certificates issued for sums loaned upon them to pay for the stock, which holding plainly covers the situation now developed by the evidence.

The judgment of the District Court is vacated and the case is remanded to that court, with directions to enter a judgment for the plaintiff for $6,900 and interest, with costs.

ANDERSON, Circuit Judge (dissenting). I think the ruling of the District Court was sound in law, and exactly applicable to the facts, now for the first time found. I do not undertake any adequate restatement of this unusually complicated case. Judge Morton's opinion, on demurrer to the original declaration (244 F. 202), is the clearest and most adequate exposition I have anywhere found. This dissent should be read with that opinion. In general, I concur in Judge Morton's view that the case should have been

determined for the defendant on the pleadings—that the plaintiff stated no case. But, even if wrong in that view, now that the facts are found, I can see no ground whatever for holding this defendant liable to this plaintiff.

Assuming, then, that the former opinion of this court (254 F. 5, 165 C. C. A. 415) correctly rules the law of the case, it is necessary to analyze closely what that rule is. Plainly, it rests upon the pretty narrow ground that, although the syndicate managers had received illegally issued stock and otherwise acted ultra vires, bona fide lenders were to be protected. The opinion states:

"The lenders being under no obligation to see that the money borrowed was applied to the payment of the stock, the underwriter's obligation to pay his subscription was not conditioned upon his receiving full paid stock."

And again, after referring to their delivery of the $800,000 note to the corporation (Refugio Syndicate) and the cancellation of the participations issued by the Guardian Trust Company, it is said:

"Its attempted cancellation, however, would not affect the rights of the then holders of outstanding participations to the extent that they had advanced money on the certificates."

While on the allegations in the declaration this conclusion might possibly be warranted, it clearly is not now warranted, unless at the trial it appeared that, in fact, such lenders and holders of outstanding participations continued to rely on the security grounded on the stock subscriptions. It did not so appear.

The new financing out of which the present litigation grows was a radically different scheme from that upon which the defendant and the other subscribers had embarked. The main item, of course, was the $300,000 loan by the Gold Fields Company—made to the corporation, not to the syndicate managers—and made, not for the purpose of financing the corporation, but in order that the Gold Fields Company might get an option on the corporation's property. This new scheme looked, not towards financing the corporation into prosperity, so that its stockholders might find their stock of value, but towards selling the property to a stranger to the entire enterprise. The record indicates that, as a condition precedent to this selling out scheme, the Guardian Trust Company wisely required the old participations to be paid off, so that it might be cleared of any responsibility for the new plan. This was ef-

fectuated, and the attorney for the Gold Fields Company became the new trustee. He now undertakes to enforce, for the benefit of his client, subscribers' obligations growing out of a scheme almost the exact reverse of the Gold Fields scheme. As to that attempt, the former opinion of this court said (254 F. 5, 165 C. C. A. 415):

"It is not alleged, however, that the $300,000 was borrowed to pay for the stock and with the managers' consent. In the absence of such allegations this loan could not be regarded as a borrowing by the managers within the contemplation of the underwriting agreement, and the underwriting subscriptions would not be collateral thereto. While we think the declaration does not state a cause of action as to the $300,000 loan, we are of the opinion that it does state one in so far as recovery is sought in behalf of the owners, legal or equitable, of participation certificates issued for sums loaned upon them."

Here is a flat holding that the plaintiff had not even stated a case for recovery against the subscribers for the benefit of the Gold Fields Company.

The net result was that the demurrer was overruled, because, as this court then construed the declaration, the holders of $26,400 of participations had not been paid, and because it did not appear that they did not rely, and had not a right to rely, on the subscribers (like the defendant) for reimbursement. The decision rested on the familiar doctrine that bona fide purchasers frequently have rights greater than those of their immediate vendors. It is one of the multiform kinds of estoppel. But the court then seems to have overlooked that such right to reimbursement, if any, was not available through the plaintiff trustee—but must be on equity proceedings in the nature of an accounting—between the holders of this $26,400 of participations and the subscribers. This defendant is not only a subscriber, but a holder of participations to the extent of $3,017.60. This makes him, on the theory of the former opinion, so to speak, both plaintiff and defendant—a situation which can only be ironed out in equity. Very likely he and other holders of unpaid participations are entitled to equalizing contributions from their fellow victims in this mismanaged and unsuccessful enterprise. The complication thus arising was in the first opinion (254 F. 13, 165 C. C. A. 423) attempted to be met, I think erroneously, by the holding that:

"Inasmuch as it is apparent that the borrowings had did not equal the sum of $800,000, the plaintiff would be bound to hold and

pay over to the managers for the Refugio Syndicate such part of the sum recovered as exceeded the amount required to pay Sedgwick's proportionate part of the borrowings actually made."

But the original right of the syndicate managers to collect from the subscribers for the benefit of the corporation was a right never vested in the trustee; it was also a right destroyed, long before this transaction, by the failure of the managers to conform to the conditions of the subscription agreement. The subscriptions have long been plainly invalid, except so far as they can be enforced for the benefit of lenders, relying and entitled to rely on these subscriptions for reimbursement. The plaintiff trustee never was vested with power to collect subscriptions for the direct benefit of the corporation. He was trustee for creditors under the syndicate agreement, not for the corporation; moreover, the promises of the subscribers never ran to the corporation; they ran to the syndicate managers and to each other. The corporation never had rights against the subscribers, enforceable by suits at law. Its rights in equity, if any, were limited to receiving the proceeds of subscriptions paid to and borrowings made by the syndicate managers (or their assignee) within the scope of their powers. I repeat, for the sake of clarity, the trustee's right to collect was primarily for the protection of lenders, not for the benefit of the corporation. The corporation, as such, could not compel the subscribers to pay on promises running to the syndicate managers, vital conditions of which the managers had disregarded.

At any rate, the former opinion, right or wrong, limited the plaintiff to recovery for the benefit of the holders of $26,400 of participation certificates. This left open for the trial court merely the question as to whether such holders continued to rely, and had a right to rely, upon the subscriptions. That question of fact has now been determined by the trial court in favor of the defendant, as shown by the conclusion of his opinion, and elsewhere in the record:

"As above indicated, I have proceeded on the theory that the Circuit Court of Appeals refers to certificates of participation issued as a part of the plan adopted by the managers for the purpose of borrowing money to be used by them in paying in cash for shares of the capital stock of the Refugio Syndicate. I find, upon all the evidence before me, that there are no owners, legal or equitable, of such participation certificates."

This ends the plaintiff's case, assuming, to

repeat, that the former opinion correctly ruled the law of the case.

At most, the issuance of new certificates by the corporation to these unpaid holders of $26,400 of certificates issued by the Guardian Trust Company merely kept alive their rights in equity (if any) for contribution against the subscribers. It neither gave power nor imposed a duty on the new trustee. As noted above, this trustee is the attorney for the Gold Fields Company and brings this suit for the benefit of his client.

This court has now reversed its ruling on the most important point in the case, viz., the liability of the subscribers, through the plaintiff trustee, to pay the $300,000 loaned by the Gold Fields Company to the corporation, not to the syndicate managers. The majority refer to the fifth ruling of the court below, which reads:

"The loan of $300,000 by the Consolidated Gold Fields of South Africa, Limited, to Refugio Syndicate upon the security of the $800,000 note of the syndicate managers as collateral did not constitute a borrowing by the managers within the contemplation of the underwriting agreement (Plaintiff's Exhibit 1), and said underwriting agreement is not enforceable as collateral to said loan," and now say: "The fifth ruling, in the view we take of the case, is likewise inapplicable. It is undoubtedly true that the loan of $300,000 by the Consolidated Gold Fields to the Refugio Syndicate upon the security of the $800,000 note as collateral was not in itself a borrowing by the managers within the contemplation of the underwriting agreement, but this tells only a small part of the story, for it appears that, on September 28, 1910, there were outstanding participation certificates, representing borrowings on the note, amounting to $290,608, to secure which the defendant's subscription agreement was pledged, the proceeds of which borrowings, at the time they were obtained, had gone into the hands of the Refugio Syndicate towards payment of the stock and to the credit of the subscribers, including the defendant; and that, *while the transaction of September 28, 1910, was in form a cancellation of the outstanding participation certificates, it was in truth and in fact nothing more than an acquisition by the Refugio Syndicate of interests in the $800,000 note representing borrowings thereon amounting to $264,368 and a pledge thereof to the Consolidated Gold Fields as security for the $300,000 note. In this way the Refugio Syndicate became the equitable and probably the legal owner of the interests of a large majority of the holders of participations in the $800,000 note,*

*which it assigned as collateral to the Consolidated Gold Fields and which Consolidated Gold Fields later acquired by foreclosure."* (Italics mine.)

From this conclusion I emphatically dissent. I think it plainly wrong as matter of law; also that it involves conclusions of fact, as distinct from law, which are not open to this court on writ of error. The gist of the scheme to which the defendant and other subscribers committed themselves was, as already stated, that the syndicate managers (their agents with limited powers) might borrow on their stock and subscriptions for stock, in anticipation of payment of their subscriptions. It was a stockholder scheme to finance their corporation, without, of course, using the credit of the corporation. The corporation was thus to have its stock paid in, in order that the capital thus furnished might be used to make the stock valuable.

The twenty-fourth finding of fact by the court below is:

"When the holders of participation certificates were paid by, the Guardian Trust Company, as stated in the sixteenth finding, no assignment of the rights, claims, remedies or choses in action of such holders was made either to the Guardian Trust Company, to the plaintiff, to the syndicate managers or to any one else."

In the face of this conclusive finding the majority hold the corporation to be an assignee (in the shoes of the original lenders) and entitled to use these rights as security for corporation borrowing. See pages 5 and 6 of the opinion. For this there is no warrant whatever.

My brethren say: "Here the loans have not been paid by the subscribers, whose obligation it is to pay them, nor by any one in their behalf, and there has been no novation substituting a new debtor." This seems to me plainly wrong. I doubt whether the doctrine of novation has any technical application to this situation. But there was a new debtor, as well as a new creditor. The new loan of $300,000 was not made to, nor was it procured by, the syndicate managers. The subscribers neither authorized nor ratified it. It was a proceeding between strangers to the subscription agreement, on which this suit is based. It was a borrowing by the corporation—from a lender desiring an option on the corporation's assets—and made as a tentative step towards liquidating (not financing) the corporation's business. It looked towards corporate death, not towards corporate life. With the proceeds

of this loan the corporation did not buy in the outstanding participation certificates—it paid them off—and the Guardian Trust Company certified that all outstanding certificates "have been surrendered to it and canceled." It is important to note that the surrender was to the old trustee; that the certificates were not handed over to the new trustee, or to the borrowing corporation; and that the trustee certified that they were canceled, which means killed. Yet, in the face of this record, the holding of the majority is that this cancellation was not a cancellation in law or in fact.

The note for this loan has now been put to judgment, and the corporation is now a ruined enterprise; it may have never been anything else. The subscribers (stockholders and potential stockholders) never agreed, directly or indirectly, to pay the debts of their corporation. But to hold them liable for debts of the corporation incurred in the regular course of its business would be far less inconsistent with the subscribers' real undertaking than is the present holding that they must pay a corporation debt incurred for the purchase of its own stock. Borrowing for its business might profit the subscribers; borrowing to buy in its own stock spells the ruin that the record shows has come.

But, assuming (what is not free from doubt) that the proceeds of the original borrowings on participations went into the treasury of the corporation, as payment pro tanto for the subscribers' stock, the application of the money derived from the new loan to the corporation of $300,000 in payment of debts owed by the syndicate managers for money paid into the corporation amounts, as noted above, to allowing a corporation to borrow on its own note for the purpose of buying in its own stock, a proposition analogous to the one with which this court dealt in Keith v. Kilmer, 261 F. 733, 9 A. L. R. 1287, Id., 272 F. 643. We there pointed out that the overwhelming weight of authority is against the legality of such transactions. Nothing could be more inconsistent with the scheme to which the subscribers were committed than to hold them legally parties to a plan for transmuting the capital stock of their corporation into debt. The plan to which they were parties was a plan to cause the capital stock to be legally and fully paid in, before they should be called upon to pay their subscriptions in full. The present holding is that, after the stock had been in part paid for, the corporation can reduce its capital stock (so far

as paid for) by transmuting nearly $300,-000 into debt; and that the subscribers can be held under their subscription agreement to reimburse the lender for the debt of their corporation thus created. Compare 1 Morawetz Corporations, § 112; Trevox v. Whitworth, L. R. 12, App. Cas. 409, 414. That is plainly illegal.

I resist the temptation to further elaboration on what I think are the many and vital errors in the treatment of this complicated case by this court. Perhaps one other matter should be referred to. This is not a case in equity; it is a suit at law, before us on writ of error. Yet the majority opinion ends, not with instructions for a new trial, but with a mandate to enter judgment for the plaintiff for $6,900, with interest and costs. In my opinion, we have on this record no power to make such order, even if the court below erred, as I think it did not.

But, apart from that technical difficulty, as this court has now changed the law of the case, the least it could in justice do is to send the case back for a new trial, or set it for further argument before this court. If this defendant is liable, so apparently are other subscribers, to the amount, perhaps, of over $300,000. The case is therefore of very substantial importance. One would expect that, in the light of the rulings now made, the defendant would probably desire to amend his answer and try questions perhaps not thought material on the law as previously ruled by this court.

I add, finally, that my confidence in my dissent is the greater because I find myself in general accord with the learned district judges (Morton and Brewster), both of whom have carefully and critically considered this case. Besides, Judge Brewster tried the case on the facts—always a more advantageous way to grasp such problems as this case presents.