## McCALLUM v. WING. *

Circuit Court of Appeals, First Circuit.
January 19, 1929.

No. 2166.

*For opinion on rehearing, see 31 F.(2d) —.

Anderson, Circuit Judge, dissenting.

Hugh W. Ogden, of Boston, Mass., for plaintiff in error.

Burt D. Whedon, of New York City (George S. Selfridge, of Boston, Mass., Wing & Russell, of New York City, and Coolidge & Hight, of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. This case comes here upon a writ of error to the District Court of the United States for the District of Massachusetts. George B. McCallum, the plaintiff in error, is the executor of the will of Alexander McCallum, and the defendant in error, Thomas E. Wing, is the trustee under a written declaration of trust. The rights of the parties have been the subject of much litigation.

The writ was dated March 2, 1914. A demurrer to the declaration was filed, and on January 12, 1915, the District Court sustained the demurrer in an opinion which appears in 244 F. 199.

From the judgment sustaining the demurrer the plaintiff sued out a writ of error, and October 3, 1918, this court vacated the judgment of the District Court and remanded the case for further proceedings. 254 F. 5.

At the time the writ in this case was brought, another writ was sued out against one Sedgwick for the same cause of action as against McCallum. This was heard on its merits and judgment entered for the defendant Sedgwick by the District Court with an opinion which appears in 299 F. 311.

To this judgment the plaintiff sued out a writ of error, and this court vacated the judgment of the District Court and ordered judgment for the plaintiff. 4 F.(2d) 177.

A petition for writ of certiorari to the Supreme Court was denied October 12, 1925. 269 U. S. 558, 46 S. Ct. 19, 70 L. Ed. 410.

Prior to trial in this case the parties entered into a written stipulation, waiving a jury and agreeing that all issues of fact be tried by the court in this case, and that depositions taken in the Sedgwick Case and exhibits therein could be offered in evidence in the trial of this case by either party. The entire record in the Sedgwick Case was made up of depositions and exhibits, and no oral proof was offered at the trial.

In the present case, in addition to the record in the Sedgwick Case, the plaintiff has offered evidence in the nature of an additional deposition of one John H. House to prove Alexander McCallum's signature to his subscription agreement and the mailing of notices calling for payment of his subscription. With this exception the plaintiff's evidence in this case is the same as in the Sedgwick Case.

The defendant has offered additional depositions of four witnesses, and additional exhibits, and also called a witness who testified at the trial.

The learned District Judge states in his opinion that after reviewing all the evidence he had only considered the defense resting upon facts not developed in the Wing-Sedgwick Case, or not presented in that case, and found nothing new to defeat plaintiff's right to recover in full the balance of the defendant's subscription in view of the conclusion reached by this court in the Sedgwick Case.

The facts in this case have been so many times stated in the protracted litigation before the courts that it is unnecessary to incumber this opinion with their restatement except so far as it may be necessary to show the questions in issue.

Alexander McCallum, the defendant's testator, with others, were stockholders in a corporation known as Refugio Syndicate. This corporation was organized under the laws of the state of New Jersey, with a capital of $1,000,000 divided into 10,000 shares of the par value of $100 each. It appears from the record that its purpose was to purchase and operate gold mines in the republic of Mexico.

On September 1, 1907, McCallum and his associates owned 2,000 shares of this company's stock. Upon that date he, with his associates, signed an underwriting agreement by which the subscribers agreed to take and pay for 8,000 shares of the capital stock of Refugio Syndicate; he binding himself to pay the sum of $46,000 towards its purchase. This underwriting agreement provided that each subscriber should turn over to the syndicate managers his interest in 2,000 shares of stock which had been previously purchased and receive $1,000 in face value of the stock of the company for each $800 of his subscription.

George W. McElhiney and E. A. Wiltsee were designated as syndicate managers, made by the subscribers to this underwriting agreement their attorneys, authorized to borrow for the account of each subscriber a sum not exceeding his cash subscription, and to pledge the underwriting agreement and all the stock underwritten as security for said loans. The syndicate managers were given the "sole direction, management, and conduct of the syndicate," and it was further provided that "the enumeration of particular and specific powers" should not be considered "as in any way limiting or abridging the general power or direction intended to be conferred upon and reserved to the syndicate managers." It is the plain import of the underwriting agreement that the subscribers to it bound themselves to take and pay for the number of shares of stock whose value should correspond to the amount of money which they subscribed, and that the managers should obtain the money by loan for the purchase of the stock.

The managers did not wait to obtain a loan before they entered into an agreement with Refugio Syndicate by which the corporation issued to them two certificates,

each dated September 30, 1907, one for 5,000 and one for 3,000 shares of its unissued capital stock of a total par value of $800,000, and received from them a written agreement by which they agreed to pay for said stock in installments; the last payment to be made upon the 1st day of March, 1908.

By a vote of the directors of said corporation, on September 30, 1907, the contract of sale was approved and its president and secretary were authorized and directed, upon the execution of the contract, to issue certificates of stock of the company to the aggregate amount of $800,000 par value to said McElhiney and Wiltsee as syndicate managers.

It was the evident intention of the syndicate managers and of the subscribers to the syndicate agreement to pay for the stock by obtaining loans with the stock as collateral, but the managers were not able to do this, and on March 2, 1908, with the evident knowledge and consent of the subscribers, the managers entered into a trust agreement with the Guardian Trust Company of New York City by which their note for $800,000 payable to bearer should be deposited in trust with the trust company and participation certificates should be issued by it to be secured by the capital stock of the company and also the underwriting agreement.

Upon the same date Refugio Syndicate also entered into an agreement with the trust company, called a deposit agreement, by·which it purported as owner of the $800,000 note to deposit the same with the trust company, and provided also for the issue of participation certificates in the same by the trust company. It is evident from the record that in making this deposit agreement Refugio Syndicate was only an instrumentality of the syndicate managers, as McElhiney was the president of the Refugio Syndicate.

It was not until March 31, 1908, that the board of directors of Refugio Syndicate voted to receive the note in payment of the subscription of the managers. At a meeting on that date the treasurer of the company reported that McElhiney and Wiltsee had offered in payment for their option for 8,000 shares of the stock of the company their note payable to bearer on the 1st day of March, 1909, and recited that McElhiney and Wiltsee were syndicate managers under and pursuant to the underwriting agreement dated September 1, 1907. The directors voted to receive this note in payment of the subscription of the managers.

Under this deposit agreement, and also the trust agreement, certificates of participation entitling the holder to share in the $800,000 note were issued by the Guardian Trust Company to the amount of $538,500. The note of $800,000, as well as the participation certificates therein, was secured by the underwriters' agreement and the capital stock of the company.

In Wing v. Sedgwick (C. C. A.) 4 F.(2d) 177, it was held that this borrowing by means of the participation certificates was an authorized borrowing by the syndicate managers under the terms of the underwriting agreement.

Under the terms of the trust agreement entered into with the Guardian Trust Company, the borrowers (the syndicate managers) covenanted and agreed to issue and confirm to the trustee (the Guardian Trust Company or successors) the securities and rights intended to be conveyed, so that the same should ·be subject to the lien of the trust agreement.

The defendant's intestate knew of this arrangement and must have assented thereto, for in a letter of McElhiney to him dated March 17, 1908, as appears in the findings of facts made by the District Court, McCallum was informed that a committee which had been appointed at a stockholders' meeting held upon January 21, 1908, to devise ways and means of providing funds for Refugio Syndicate, had hit upon a plan of making the Guardian Trust Company trustee issue participation loan certificates in the $800,000 note, and he was then asked to take one of the notes. He thereafterwards purchased a certificate of participation to·the amount of $5,000 which has been reduced by payments to the sum of $3,280.

Two calls of 12½ per cent. each were made upon the subscribers to the underwriting agreement in order to pay these outstanding certificates of participation, and in a letter to the defendant's intestate of July 15, 1909, and also in a letter to him of January 27, 1909, he was informed of the purposes of the syndicate managers in relation to the participation certificates in the $800,000 note of the syndicate managers and that they would be secured by the underwriting agreement.

In response to the calls of the syndicate managers, McCallum paid two assessments of 12½ per cent. each upon his subscription.

The money received from the calls upon the subscribers to the underwriting agree-

ment was applied to the payment of participation certificates which had been issued, so that on September 28, 1910, they had been reduced to the amount of $290,608. The holders of these certificates which had matured were pressing for payment.

The opinion of the District Court [16 F. (2d) 645] states: "It is impossible to make a definite finding that all the money borrowed by these certificate holders reached the treasury of the Refugio Syndicate. I do find that $230,000 of their borrowings were paid into the account of the Refugio Syndicate." It is also stated in another part of the opinion: "The evidence clearly warrants the conclusion that a very substantial portion of the money realized from the participation certificates was turned over to the Refugio Syndicate." From the testimony of Wright Johnson, treasurer of Refugio Syndicate from September, 1907, to November, 1912, who submitted a statement of the amounts received from the sale of participation certificates and upon the two calls upon the subscribers to the underwriting agreement, it appears that these amounts were "received by the Refugio Syndicate either in cash or in the equivalent of cash," and that all moneys that came into his hands or were accounted for to him were disbursed for the benefit of Refugio Syndicate. The following explanation was made of these disbursements: "In a general way these moneys were disbursed for the purchase of mining properties in Mexico, and the other expenditures were for the maintenance of the property, for mining examinations, for maintenance of the New York office and for interest charges."

The Consolidated Gold Fields of South Africa, Limited, a British corporation, had become interested in the purchase of the property of Refugio Syndicate and wished to make an examination of it. It was willing to make a loan to take care of the participation certificates in the $800,000 note that had been issued, and to accept the $800,000 note with the underwriting agreement as security. It therefore made a loan of $300,000 on its face to Refugio Syndicate, and accepted as security the following:

"$800,000 note of George W. McElhiney and Ernest A. Wiltsee, as Syndicate Managers, dated March 2, 1908, maturing March 1, 1909, payable to bearer at the Guardian Trust Company of New York, whereof $642,500 with interest is unpaid, and wherein holders of outstanding participation certificates have participation as owners

amounting to $26,240 with interest from September 28, 1910, which said note and all participations therein are equally secured by a certain trust agreement dated March 2, 1908, between said Syndicate Managers and Guardian Trust Company of New York, as trustee, and the securities deposited thereunder. Assignment in blank of all the right, title and interest of Refugio Syndicate in, to, and under a certain subscription agreement between George W. McElhiney and Ernest A. Wiltsee as Syndicate Managers and said Refugio Syndicate bearing date September 30, 1907."

The District Court has found that the proceeds of the $300,000 note which was loaned by the Gold Fields were deposited to the general account of Refugio Syndicate in the Guardian Trust Company, from which participation certificates outstanding to the amount of $275,144.70 were paid, and that the balance was retained in the treasury of Refugio Syndicate and later disbursed for that corporation's account. The District Court [16 F.(2d) 645] further finds that "all the outstanding participation certificates were then surrendered for cancellation."

The deposit agreement of March 2, 1908, under which the participation certificates had been issued, was canceled and the $800,000 note delivered by the Guardian Trust Company to Refugio Syndicate. As the note was secured by the underwriters' agreement, Gold Fields, before accepting it as security for its loan, desired the participation certificates paid.

The holders of participation certificates amounting to $26,240 were not paid. Among these was the defendant's intestate, who held a participation certificate for the amount of $5,000, which had been reduced by payments to $3,280. The holders of these unpaid certificates later surrendered them and received in lieu thereof new participation certificates issued by Refugio Syndicate.

As all these outstanding participation certificates were secured by the subscription agreement, this court held, in Wing v. Sedgwick, supra, page 181 of 4 F.(2d), that: "While the transaction of September 28, 1910, was in form a cancellation of the outstanding participation certificates, it was in truth and in fact nothing more than an acquisition by the Refugio Syndicate of interests in the $800,000 note representing borrowings thereon amounting to $264,368, and a pledge thereof to the Consolidated Gold Fields as security for the $300,000

note. In this way the Refugio Syndicate became the equitable and probably the legal owner of the interests of a large majority of the holders of participations in the $800,000 note, which it assigned as collateral to the Consolidated Gold Fields and which Consolidated Gold Fields later acquired by foreclosure.''

The statement therein made that the loan of Gold Fields was not a borrowing by the syndicate was not necessary to a decision of the case.

It is true that a large part of the sum borrowed from Gold Fields was used to take up outstanding participation certificates in the $800,000 note, and that these were obligations of the subscribers to the underwriting agreement.

While the $300,000 note was not upon its face a borrowing by the syndicate managers, Refugio Syndicate in making the loan was a mere instrument in their hands and Mc-Elhiney was its president. Under the broad powers conferred upon the managers by the subscription agreement, the $300,000 note, the proceeds of which were used to pay off the participation certificates which the subscribers to the underwriting agreement were legally bound to pay and the balance of which was paid over to the treasury of Refugio Syndicate, was in reality a loan to the syndicate managers through the instrumentality of Refugio Syndicate which they controlled, and therefore became an obligation which the subscribers to the underwriting agreement were bound to pay.

We concur in the finding of the District Court that the allegation of fraud was not sustained, and that the defendant's intestate was not induced to sign the underwriting agreement by any representations that were made in regard to the purposes of Refugio Syndicate as to the mining properties in Mexico, for these representations were made long after the signing of the underwriting agreement. This action is brought to enforce the obligation of a subscriber to that agreement, and no representations made after its signing could have influenced the defendant's intestate to sign it.

The whole transaction was highly speculative, and at a meeting of the stockholders of Refugio Syndicate held June 4, 1908, at which A. McCallum was present in person representing 115 shares, a resolution was adopted ratifying the acts of the officers and directors of the company and all acts ''of every kind and nature performed by or on behalf of the company from its organization to the present time.'' At this time Refugio Syndicate had accepted the note of $800,000 in payment for 8,000 shares to its capital stock. While it, as a New Jersey corporation, could not accept in payment of its capital stock anything but cash or its equivalent, yet stockholders who participated in and assented to the issue of stock for a note secured by their subscription agreement are estopped from attacking the issue of stock because not issued for cash. Cook on Corporations, vol. 1, § 39. See First National Bank v. Cornell, 8 App. Div. 427, 40 N. Y. S. 850.

In Wing v. Sedgwick, supra, it was held that it would not be a defense to an action brought by the trustee on the underwriting agreement in behalf of lenders on participation certificates whether shares of stock of Refugio Syndicate were fully paid and lawfully issued or not. The underwriters' agreement clothed the syndicate managers with very broad powers, and provided in section 4 that ''the note or other obligation of the Syndicate Managers shall be binding upon the subscribers and their assigns in favor of the lender and its assigns and without the duty on the part of such lender to inquire into the performance by the Syndicate Managers of any of their obligations hereunder.'' This section also provides that the managers may pledge for loans the subscription of each subscriber to the underwriting agreement.

The trustee has collected from various subscribers to the underwriting agreement $168,829.79, the proceeds of which, after deducting expenses and legal fees, have been remitted to Gold Fields. He is legally entitled to recover from them the balance of the loan of Gold Fields of $300,000. The subscription of the defendant's intestate was for $46,000, upon which he has paid under two calls of the managers $11,500, leaving a balance unpaid of $34,500. He is the holder of a participation certificate for $5,000 which has been reduced by payments to $3,280, but whatever claim he may have for the payment of the balance due him under the participation certificate is not involved in this case.

Gold Fields became the owner of the $800,000 note deposited as security for the loan of $300,000, and in this suit the plaintiff can recover from the subscribers to the underwriting agreement the amount of its loan with interest.

We think the court did not err in disallowing defendant's claim of set-off as an equitable defense, nor do we think the court

510

erred in the allowance of interest in this action.

█ It is contended that the trustee was not authorized to bring this action, but the trust agreement entered into between the syndicate managers and the Guardian Trust Company as trustee provided for the substitution of another trustee. Where, by the terms of the trust agreement itself, the filling of a vacancy in the office of trustee is provided for and a trustee is appointed in accordance therewith, he succeeds to the property held in trust without any formal transfer to him. See 39 Cyc. 271. The power of the trustee to bring this action is not raised by any assignment of error. There is no merit in the contention of the defendant that the consent of Gold Fields to the appointment of the trustee was not legal, nor do we find any merit in the other contentions of the defendant.

The judgment of the District Court is affirmed, with costs to the defendant in error.

ANDERSON, Circuit Judge, dissents, for the reasons stated in his dissenting opinion in Wing v. Sedgwick (C. C. A.) 4 F.(2d) 179 et seq.